UNITED STATES of America,
Plaintiff–Appellee,

v.

John Leslie LEAVIS, Jr., a/k/a
Johnny, a/k/a John Levies,
Defendant–Appellant.

No. 87–5183.

United States Court of Appeals,
Fourth Circuit.

Argued May 5, 1988.

Decided July 22, 1988.

Aida Fayar Doss, Thomas Peter McNamara (McNamara, Pipkin & Knott, Raleigh, N.C., Castelar Garcia, Manassa, Colo., on brief), for defendant-appellant.

Geoffrey Brigham (Samuel Rosenthal, Chief, Appellate Section, Crim. Div., U.S. Dept. of Justice, Washington, D.C., Margaret P. Currin, U.S. Atty., Raleigh, N.C., on brief), for plaintiff-appellee.

Before WILKINSON, Circuit Judge, BUTZNER, Senior Circuit Judge, and GORDON, Senior U.S. District Judge for the Middle District of North Carolina, sitting by designation.

WILKINSON, Circuit Judge:

John Leavis was convicted of several offenses stemming from his involvement in a conspiracy to import cocaine into North Carolina. He appeals, contending that the district court erred in admitting certain evidence against him. We affirm.

## I.

Beginning in the spring of 1985, several persons laid plans to import cocaine into

North Carolina. The operation was centered in Wrightsville Beach and revolved around Chester Scarborough. In August, 1985, the group successfully imported cocaine by airplane. Sometime after this importation, agents of the Drug Enforcement Administration (DEA) became aware of the operation and instituted surveillance measures.

Leavis became involved with the enterprise in the spring of 1986, at which time the conspirators were planning to repeat their scheme. On May 11, 1986, Leavis traveled with Scarborough and others to Fayetteville to meet with one McCall, an electronics specialist. Scarborough introduced Leavis to McCall as the "new pilot." During the visit, Leavis and the others discussed countersurveillance technology for aircraft, including methods of avoiding radar detection. Leavis asked McCall about equipment that could fool radar by projecting a false location of the plane. After the meeting, Scarborough asked McCall to make the device that he and Leavis had discussed.

Several days later, Scarborough met with James Shell, a military air scheduler. At the bidding of DEA agents, Shell wore a microphone and recorded their conversation. Scarborough detailed the plan to smuggle drugs, and Shell agreed to look for "windows," or times during which an airplane could land without detection. Several days after the lunch, Scarborough brought Shell an extensive list of questions written by Leavis pertaining to the "windows." One question, for example, asked: "If confronted by aircraft [could] he cover, should anything spec. be done?" Shell and Leavis had a telephone conversation during which they discussed these questions.

On June 5, Leavis flew to Detroit, where he became aware of DEA surveillance. He telephoned members of the conspiracy several times to inform them of the "problem" and reported to local police that he was being followed. Later that evening, Leavis told Scarborough that "we'll still plan on a go." Concern over the DEA surveillance, however, caused Leavis to cease communi-

cations with other members of the conspiracy shortly thereafter.

In September, 1986, Leavis was spotted by United States Customs Service agents while flying a small plane in Florida. Upon landing, he gave the agents permission to search the plane, and they found a fuel bladder, a device frequently used by drug smugglers to increase the range of a small plane. Such a bladder had played a role in the drug conspiracy's August, 1985 importation of cocaine. Although such bladders must be inspected and approved by the Federal Aviation Administration, the agents found no documentation of inspection or approval. The agents did not, however, detain Leavis at that time.

Leavis was arrested by DEA Agent Michael Grimes in June, 1987, in Colorado. He denied involvement in the conspiracy. Leavis told Grimes that he had gone to North Carolina in 1986 to sell an airplane, and that he had been asked to "run a load" and had refused. Grimes searched Leavis' home and found walkie-talkies, which Grimes testified are often used by drug smugglers.

Leavis was charged, along with Scarborough and three others, with various offenses including conspiracy to import cocaine and conspiracy to possess cocaine with intent to distribute. Scarborough and the others pled guilty. At trial, Leavis repeated the story he had told to Grimes. He also testified that he feared Scarborough, and that he wrote down the questions for Shell and spoke with Shell on the telephone in order to appear cooperative. Leavis was convicted on both conspiracy counts and of various other offenses. He now appeals, contending that the district court erred in admitting certain evidence.

## II.

The government charged a single, ongoing conspiracy which began in the spring of 1985 and continued through the summer of 1986. At trial, Leavis moved *in limine* to exclude all evidence pertaining to the conspiracy's activities leading up to and culminating in the August, 1985 importation of cocaine. Leavis argued that the acts of the

conspirators constituted two separate conspiracies, a "1985 conspiracy," which ended with the August, 1985 importation, and a "1986 conspiracy," which was unsuccessful. He argued that evidence of the former could not be used against him because he did not become involved with the conspiracy until May, 1986. The district court denied the motion. We affirm.

■ The essence of Leavis' argument is that he was unfairly prejudiced by the admission of evidence of the 1985 importation. The government, however, never made any contention at trial that Leavis was involved in the 1985 importation. Leavis' claim of unfairness seems no different from that of any conspirator who claims to be prejudiced by evidence that goes to the activities of coconspirators. Ordinarily, members of a conspiracy are tried together, and severance is within the discretion of the trial judge. *United States v. Parodi*, 703 F.2d 768, 779 (4th Cir.1983). Here, because Leavis' coconspirators pled guilty, he was tried alone. That fact, however, would not deprive the government of its right to detail the full scope of the conspiracy and to present its case in proper context.

■ The government bears the burden of proving a single conspiracy charged in an indictment. *United States v. Hines*, 717 F.2d 1481, 1489 (4th Cir.1983). If a single conspiracy is proved, a defendant need not be involved in every phase of that conspiracy to be deemed a participant. In his motion *in limine*, Leavis asked the district court to rule that the acts charged in the indictment constituted, as a matter of law, two conspiracies. The question whether the evidence shows a single conspiracy or multiple conspiracies, however, is one of fact and is properly the province of the jury. *United States v. Urbanik*, 801 F.2d 692, 695 (4th Cir.1986); *United States v. McGrath*, 613 F.2d 361, 367 (2d Cir.1979) (question is "singularly well-suited to resolution by the jury"). The district court did not abuse its discretion in submitting the question to the jury.

■ A single conspiracy exists where there is "one overall agreement," *United States v. Bloch*, 696 F.2d 1213, 1215 (9th Cir.1982), or "one general business venture." *McGrath*, 613 F.2d at 367. Whether there is a single conspiracy or multiple conspiracies depends upon the overlap of key actors, methods, and goals. *United States v. Crockett*, 813 F.2d 1310, 1316–17 (4th Cir.1987); *United States v. Little*, 753 F.2d 1420, 1448 (9th Cir.1984).

The key actors here, including Scarborough, organized both the 1985 importation and the aborted 1986 attempt. Their operations were headquartered in the same beach house. The methods and goals of the conspiracy remained the same throughout its activities. In 1985, the conspirators had used a small airplane to import five duffle bags of cocaine from Colombia into North Carolina. The 1986 importation was planned to mirror the 1985 smuggling, using a similar plane to transport the same amount of cocaine, packed again in five duffle bags. In each operation, the conspirators used or planned to use a fuel bladder like that found in Leavis' plane.

■ Leavis raises two arguments in support of his claim that there were two conspiracies. First, he contends that the successful importation of cocaine in August, 1985 brought an end to the "1985 conspiracy." A conspiracy, however, is presumed to continue until there is affirmative evidence of abandonment or defeat of its purposes. *Bloch*, 696 F.2d at 1215. The conspiracy's success in importing drugs in 1985 does not, in itself, provide evidence of the conspiracy's end.

■ Leavis also contends that an eight-month gap in overt acts by the conspiracy between that importation and the resumption of activities in the spring of 1986 demonstrates the existence of two separate conspiracies. This argument must also fail because "[a] single overall agreement need not be manifested by continuous activity." *Id.; see also United States v. Calbas*, 821 F.2d 887, 892 n. 2 (2d Cir.1987). There are a host of reasons for a conspiracy such as the one at issue in this case to suspend active operations for a period: for logistical reasons, to escape detection, or even to

afford its members an opportunity to spend their ill-gotten gains. Our focus must be not on the timing of the conspiracy's operations, but on whether it functioned as an ongoing unit.

■ Leavis makes much of statements made by Scarborough in a May, 1986 conversation with Shell that "[i]t's a whole different operation now, different people" and "[i]t's a whole new outfit, its all professional now." There was other evidence, however, to show that the conspiracy was ongoing. In the same conversation, Scarborough told Shell, "I've made money with them. Constantly, over this three and [one] half years." Furthermore, the membership, goals, and methods of the group remained the same throughout 1985 and 1986. There was ample evidence upon which a jury could have based its finding that a single conspiracy existed.

### III.

At trial, the prosecution introduced into evidence against Leavis certain tape recordings and wiretap evidence of conversations among the conspirators. The district court admitted those out-of-court statements under Fed.R.Evid. 801(d)(2)(E), which provides:

> (d) *Statements which are not hearsay.* A statement is not hearsay if—
>
> .    .    .    .    .
>
> (2) *Admission by party-opponent.* The statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Fed.R.Evid. 801(d)(2)(E). Before this evidence could be admitted, the government had to satisfy the court by a preponderance of the evidence of the existence of a conspiracy and Leavis' participation in it. *Bourjaily v. United States,* — U.S. —, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987). We reject Leavis' contention that the government failed to do so here.

Leavis' attack on this evidence rests upon the "bootstrap rule" of *Glasser v. United States,* 315 U.S. 60, 74–75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). There the Supreme Court held that the existence of a conspiracy and the defendant's participation in it must be proved by independent evidence before the hearsay statements of coconspirators may be admitted. If the hearsay statements themselves could be used to establish these preliminary facts, the Court wrote, "hearsay would lift itself by its own bootstraps to the level of competent evidence." *Id.* at 75, 62 S.Ct. at 467.

The Supreme Court revisited the bootstrapping rule, however, in *Bourjaily v. United States,* — U.S. —, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). There the Court noted that the bootstrapping rule emerged before the enactment of the Federal Rules of Evidence and, in particular, the enactment of Fed.R.Evid. 104(a). Rule 104(a) provides in relevant part:

> Preliminary questions concerning ... the admissibility of evidence shall be determined by the court ... In making its determination it is not bound by the rules of evidence except those with respect to privileges.

Fed.R.Evid. 104(a). The *Bourjaily* Court held that Rule 104(a) permits a court to consider the coconspirator statements sought to be admitted under Rule 801(d)(2)(E) in determining whether that Rule's preliminary requirements have been met. *Bourjaily,* 107 S.Ct. at 2780. To the extent that Leavis argues that the district court erred in considering the statements at all, his argument is flatly inconsistent with *Bourjaily* and must be rejected.

■ The *Bourjaily* Court reserved the question whether a court making the preliminary determinations required by Rule 801(d)(2)(E) may make those determinations *solely* on the basis of the coconspirators' statements. *Id.* at 2781–82. We need not address this question, because the district court's determination that a conspiracy existed and that Leavis participated in it was made on the basis of independent evidence as well as on the basis of the coconspirators' statements themselves.

First, there was independent evidence of the existence of the conspiracy. Leavis admits that there was substantial independent evidence of what he terms the "1985

conspiracy," but argues that that conspiracy was separate from the "1986 conspiracy" in which he was involved, and that independent evidence of the former may not be considered in determining the existence of a conspiracy here. As is discussed above, however, the evidence supported a finding of a single conspiracy. Furthermore, testimony and photographs placed the conspirators together at the beach house and other locations in 1986, and indicated that they shared possession of a suitcase containing equipment used in the 1985 importation.

Independent evidence of Leavis' participation in the conspiracy included the testimony of a handwriting expert, who stated that Leavis had written the list of questions concerning landing "windows," which was presented to Shell by Scarborough. Leavis himself admitted that he had written the questions. Shell also identified Leavis as having discussed the questions with him over the phone. Photographs at trial demonstrated the close relationship Leavis enjoyed with the other coconspirators in the importation scheme.

The district court's consideration of coconspirator statements in making the preliminary determinations required by Rule 801(d)(2)(E) was clearly permissible under *Bourjaily.* Independent evidence buttressed the court's finding. We cannot say that the district court was clearly erroneous in determining that the government had met its burden of proving, by a preponderance of the evidence, the elements of admissibility under the Rule. *See Bourjaily,* 107 S.Ct. at 2782.

### IV.

Leavis also objects to the district court's admission of evidence of his 1973 felony conviction for possession of marijuana, arguing that that evidence was barred by Fed.R.Evid. 609(b). Rule 609(a) permits the introduction of evidence of a witness's prior convictions "[f]or the purpose of attacking [his] credibility." Rule 609(b), however, forbids the introduction for such purposes of evidence of a conviction more than ten years old, unless the probative value of that evidence substantially outweighs its prejudicial effect.

The evidence to which Leavis objects, however, was not introduced on the general Rule 609 theory "that people who do certain bad things are not to be trusted to tell the truth." *United States v. Johnson,* 542 F.2d 230, 235 (5th Cir.1976). Rather, it was introduced to contradict specific statements made by Leavis on direct examination. This is not the type of situation to which Rule 609(b) was meant to apply. *United States v. Babbitt,* 683 F.2d 21, 25 (1st Cir. 1982); *Johnson,* 542 F.2d at 234–35. Instead, admission is analyzed under Fed.R. Evid. 403 and subject to the broad exercise of the district court's discretion.

Testimony at trial revealed that the conspirators often used the word "dancing" as code for "smuggling." During his direct examination, Leavis was asked if he had "ever use[d] the phrase, going dancing in connection with this case?" He replied, "I've gone dancing but not this kind of dancing." He later stated:

> I've worked on airplanes off and on for more than fifteen years and I'd never found myself in a situation like I was in, being confronted by some people like this and having to try to get away from them and the fear that they instilled; the way they made me feel; I just wanted to get away from them.

It was within the district court's discretion to conclude that by these statements Leavis implied that he had had no prior contact with drugs or drug dealers, and to admit the evidence of Leavis' prior felony drug conviction to contradict his direct examination. The prosecution was entitled, as the district court held, to rebut the false impression Leavis was creating by his testimony. *Cf. Harris v. New York,* 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1 (1971).

### V.

Finally, Leavis objects to the admission against him of evidence obtained through wiretaps pursuant to court order. Leavis contends that the application of DEA agents for the wiretap was faulty and that

a reconnection of the intercept within the thirty-day period of the order required a reauthorization as well. We find no merit in either contention.

### A.

A wiretap application under 18 U.S.C. § 2518 must contain

[A] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. § 2518(1)(c). Leavis claims that the application in this case did not state in sufficient detail why the wiretap was necessary.

■ A statement provided under § 2518(1)(c) must provide the court with sufficient detail to allow the court to determine the necessity of a wiretap. The mere "boilerplate recitation of the difficulties of gathering usable evidence" cannot suffice. *United States v. Kerrigan*, 514 F.2d 35, 38 (9th Cir.1975). The showing made under § 2518(1)(c), however, must "be tested in a practical and commonsense fashion." *United States v. Clerkley*, 556 F.2d 709, 714 (4th Cir.1977) (quoting legislative history). Applying that standard to the case at hand, we find the application sufficient.

■ The application stated that a confidential informant was not in a position to provide information regarding the "complete scope and nature" of the conspiracy or to identify coconspirators. Leavis faults this statement for failing to explain why the informant was unable to do so, but he ignores the declaration in the application that Scarborough had told the informant that he did not intend to utilize the informant's services and that the informant would not be privy to any specific information. That declaration was sufficient to inform the court that the informant would be unable to provide information regarding the upper levels of the conspiracy. In such a situation, a wiretap may be necessary. *See Clerkley*, 556 F.2d at 714–15.

The application also stated that search warrants would not uncover the entire con-

spiracy because the leaders of the conspiracy employed others to carry out the actual transportation of drugs. Leavis argues that this statement is conclusory because it fails to state how DEA agents knew this. Again, however, this argument overlooks the declaration by Agent Grimes that the informant had provided this information.

The application states that ordinary surveillance had been utilized, but that it was not likely to provide further information because the conspirators had employed countersurveillance, because their beach house was situated in a location that made surveillance difficult, and because ordinary methods of surveillance would reveal, at best, only the identities of individuals who came into contact with the conspiracy, and not the nature of their relationship with it. Leavis contends that the transient population in the location of the beach house would make ordinary surveillance easier because agents would not arouse suspicion. The district court, however, was entitled to conclude that other factors could have made ordinary surveillance difficult or impossible.

Finally, the application states that telephone toll and pen register information would reveal the fact of contacts between conspirators, but would fail to disclose the substance of those contacts. We find no fault with this statement. Telephone records may raise the suspicion of illegal activity, but where they do not reveal the substance of conversations, may be insufficient to prove the elements necessary for a successful prosecution. This is particularly true where the underlying crime is conspiracy, which requires proof of agreement. *See United States v. Brown*, 761 F.2d 1272, 1276 (9th Cir.1985).

■ Wiretaps are extraordinary investigative means. Their intrusiveness mandates that courts, in authorizing them, exercise great care in protecting individual privacy. *See United States v. Bobo*, 477 F.2d 974, 979 (4th Cir.1973) (electronic surveillance permissible only when "judicially authorized under the most precise and discriminating circumstances"). They are necessary tools of law enforcement, how-

ever, particularly where crimes are committed by large and sophisticated organizations. Reading the requirements of § 2518(1)(c) in an overly restrictive manner would hamper unduly the investigative powers of law enforcement agents.

The DEA agents in this case provided the court ample information on the basis of which to determine the need for the wiretap. The application's § 2518(1)(c) statement explained that traditional methods of surveillance were unlikely to succeed. The statement's assertions were backed up with specific factual information, the veracity of which Leavis does not dispute. In these circumstances, we decline to disturb the district court's conclusion that such surveillance was necessary to probe a conspiracy that might otherwise have proved impossible to penetrate.

### B.

■ The court order for the wiretap stated that the intercept was to terminate within thirty days or after it had revealed the nature and scope of the drug conspiracy. Within this period, drug enforcement agents temporarily disconnected the wiretap for a period of twenty-one hours in order to avoid detection by an electronics expert working for the conspiracy. After the danger passed, and still within the authorized time period, the agents reconnected the intercept.

Leavis argues that the disconnection terminated the authorized wiretap and that the reconnection constituted a second intercept which required separate authorization from the court. Because the agents did not apply for such authorization prior to reconnecting the wiretap, Leavis asserts, the evidence obtained after the reconnection was obtained illegally and was therefore inadmissible.

First, and most importantly, Leavis points to nothing in the statute forbidding the temporary disconnection of an authorized wiretap or requiring that reconnection be authorized separately. The statute forbids the authorization of a wiretap for "any period longer than is necessary to achieve the objective of the authorization,"

18 U.S.C. § 2518(5), and requires the order authorizing the wiretap to state the period of time during which the intercept is authorized. 18 U.S.C. § 2518(4)(e). There is no suggestion that the order in this case failed to meet either of these requirements, and the statute is otherwise silent as to the timing of a wiretap.

Leavis suggests that the need to protect individual privacy mandates that a reconnection like that at issue here be accompanied by a reapplication. He does not, however, explain how the reconnection created any threat to privacy in addition to that weighed by the district court in granting the initial application. Temporary disconnection resulted in, if anything, a lesser intrusion than would have resulted if the intercept had remained operational for the full thirty days authorized by the order. In fact, the rule advocated by Leavis would encourage greater intrusion, as law enforcement agents would be hesitant to disconnect wiretaps temporarily even during periods when there was no chance that the intercept would result in useful evidence.

Temporary disconnection may also be necessary where, as here, law enforcement agents fear detection. To require reapplication after such a disconnection would frustrate their ability to conduct effective surveillance while affording no additional protection of privacy.

### VI.

We find no error in the various evidentiary rulings of the district court. We hold also that there was substantial evidence to support the jury's verdict of conviction on the seven counts, and we find no merit in Leavis' remaining assignments of error. The judgment of the district court is therefore

AFFIRMED.