944 F.2d 902
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ted A. DELINOIS, Defendant-Appellant.
 No. 90-5214.
 United States Court of Appeals, Fourth Circuit.
 Argued July 12, 1991.
Decided Sept. 23, 1991.
 
 Appeal from the United States District Court for the Western District of Virginia, at Roanoke. James C. Turk, Chief District Judge. (CR-89-154-1-R)
 Argued: William H. Cleaveland, Rider, Thomas, Cleaveland, Ferris & Eakin, Roanoke, Va., for appellant; Joseph William Hooge Mott, Assistant United States Attorney, Roanoke, Va., for appellee.
 On Brief: E. Montgomery Tucker, United States Attorney, Roanoke, Va., for appellee.
 W.D.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, and PHILLIPS and SPROUSE, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Ted A. Delinois was convicted of possession with intent to distribute and conspiracy to distribute crack cocaine, possession of a firearm by a convicted felon, and use of a firearm during a drug transaction. Finding that substantial evidence supports the jury's verdict, we affirm.
 
 I.
 
 2
 In late October 1988 Ted A. Delinois and his friend Manuel Martinez, both of whom lived in New York, came to Roanoke, Virginia aboard a Greyhound bus, bringing with them crack cocaine. Delinois and Martinez had heard in New York that a rock of crack that sold for $5 in New York would bring $25 in Roanoke. The two sold some of the crack at an open air crack market and enlisted "workers" to sell the rest, realizing $2000 to $2500 from the sales.
 
 
 3
 Delinois and Martinez returned to New York for more cocaine and returned to Roanoke a day later by bus, this time carrying 62.5 grams of cocaine powder. They rented an apartment and manufactured cocaine base there by cooking the powder into base. Delinois testified that he did the cooking. The two men cut and packaged the crack for resale, and with the help of workers sold it all within three days at a profit of $4,500-$5000.
 
 
 4
 The duo went back to New York a second time to resupply, returning to Roanoke about two days later with one-eighth kilogram of cocaine, a larger amount than they had previously brought. Again they manufactured cocaine base and proceeded to sell, but on the second day in Roanoke Martinez was arrested with five rocks in his possession. Martinez, an indicted co-conspirator, was jailed and subsequently released after having entered a guilty plea.
 
 
 5
 While Martinez was in jail he kept in contact with Delinois and with other individuals involved in the cocaine trafficking operation. They discussed drug activities using codes, and talked about Delinois's acquisition of various assets, including a house and numerous automobiles. Delinois told Martinez about the expansion of the selling organization, an increase in the quantity of drugs being distributed, and the incorporation of additional persons into the enterprise.
 
 
 6
 Delinois stopped transporting his own cocaine, instead enlisting a number of others to bring it to him from New York. However, by early July 1989 the price of cocaine in New York had gone up, leading Delinois and several of the others to decide to go to Florida to get a supply. Delinois and co-conspirator Reginald LeRiche paid for a kilogram, which two other conspirators brought back to Roanoke in their car. After paying the couriers with a small portion of the cocaine, Delinois and LeRiche sold the balance of the kilogram in Roanoke.
 
 
 7
 Upon his release from jail, Martinez cooperated with the government and monitored the activities of Delinois and his associates. Martinez gave sworn testimony that a few weeks after his release, in late July or early August 1989, he was present in Delinois's bedroom at his residence when Delinois had a dispute with a worker who was smoking crack instead of selling it. Martinez stated that Delinois threatened the worker with a pistol-gripped riot shotgun which he kept under his bed.
 
 
 8
 A paid informant, James Kasey, testified concerning a specific large-scale transaction between one Sonny Ramsey and Delinois, and stated that he had observed Delinois selling at the crack markets. Another conspirator, Louissage Auguste, informed federal agents that Delinois was in New York in November 1989 buying cocaine to bring back to Roanoke. A federal agent met Delinois's bus when it arrived in Roanoke on November 29, 1989, but a third person travelling with Delinois escaped with the cocaine. A small amount was found on Delinois, and he was later convicted in Roanoke City Circuit Court of cocaine possession, a felony under Virginia law.
 
 
 9
 In October 1989, prior to Delinois's arrest, agents obtained arrest warrants for the conspirators and a search warrant for Delinois's residence. There the agents found photographs and documents later introduced into evidence and a 12-gauge pistol-gripped Mossberg shotgun, but no drugs.
 
 
 10
 Subsequently, a federal grand jury returned an eight-count indictment against Delinois in the United States District Court for the Western District of Virginia at Roanoke. The indictment charged the following offenses: (1) one count of conspiracy to manufacture and distribute and conspiracy to possess with the intent to distribute crack cocaine, in violation of 21 U.S.C. § 846; (2) five counts of manufacture of, possession with intent to distribute, and distribution of crack cocaine, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(A)(ii)-(iii); (3) one count of using a firearm during a drug transaction, in violation of 18 U.S.C. § 924(c)(1); and (4) one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2).
 
 
 11
 At trial, the jury found Delinois guilty on all counts. The district court sentenced Delinois to 144 months' imprisonment as to Counts 1 through 6, to run concurrently, and 60 months' imprisonment on Counts 7 and 8, to run consecutively to the sentence for Counts 1 through 6. Delinois was also given 5 years' supervised release under specified conditions and ordered to pay a $400 special assessment. This appeal followed.
 
 II.
 
 12
 Delinois alleges on appeal that the jury's findings that a single conspiracy existed and that he used a firearm during a drug transaction are not supported by sufficient evidence. Delinois also contends that the district court's admission of several statements by co-conspirators was clearly erroneous. We address each of these matters in turn.
 
 Conspiracy
 
 13
 The government has the burden to prove that the defendant was engaged in a single conspiracy, rather than in multiple conspiracies. If, as here, the jury found that the evidence adduced supported the conclusion of a single conspiracy, the reviewing court must view that evidence in the light most favorable to the government and decide that it was insufficient to allow a rational factfinder to reach that conclusion in order to reverse the jury's finding. United States v. Urbanik, 801 F.2d 692, 695 (4th Cir.1986). The government may meet its burden by producing evidence supporting the inference that the conspirators were acting pursuant to one overall agreement, in pursuit of one general business venture. United States v. Leavis, 853 F.2d 215, 218 (4th Cir.1988).
 
 
 14
 In this case, there was abundant evidence which would support the conclusion that the participants were engaged in the general business venture of cooperating to sell cocaine in the Roanoke area in a continuous operation during a given period in time. Delinois asserts that he was not always involved in all of the transactions and that some of the participants did not know him. However, neither of those elements prevents the finding of a single conspiracy. See Urbanik, supra, 801 F.2d at 696; Leavis, supra, 853 F.2d at 218. Although common actors are not a sufficient nexus to prove one overall conspiracy, United States v. Snider, 720 F.2d 985, 988 (8th Cir.1983), cert. denied, 465 U.S. 1107 (1984), evidence of the regularity and volume of dealings, common methods and goals, common infrastructure, and more or less continuous operation substantially strengthens that nexus. 720 F.2d at 988-89; Leavis, supra, 853 F.2d at 218; United States v. Burman, 584 F.2d 1354, 1357 (4th Cir.1978), cert. denied, 439 U.S. 1118 (1979).
 
 
 15
 Delinois claims that there was no cautionary instruction informing the jury that it could find multiple conspiracies and that it could only convict him if it found him to be a member of a single conspiracy as charged in the indictment. If, as here, the facts support the existence of a single conspiracy, the jury need not be instructed about the option of finding multiple conspiracies. United States v. Crockett, 813 F.2d 1310, 1316-17 (4th Cir.), cert. denied, 484 U.S. 867 (1987).
 
 Section 924(c) Use of a Firearm
 
 16
 Section 924(c), in the revised version included in the Comprehensive Crime Control Act of 1984, reads as follows:
 
 
 17
 (c)(1) Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years.... 18 U.S.C.A. § 924(c)(1) (West Supp.1990) (emphasis added).
 
 
 18
 Congress revised the statute in 1984 by adding the underlined phrase, "in relation to," to prevent the statute from being applied to people who inadvertently possessed a firearm when they engaged in completely unrelated criminal conduct. S.Rep. No. 225, 98th Cong., 2d Sess. 312, 314 n. 10, reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3492 n. 10. The statute as revised therefore imposes upon the government the burden of establishing a relation or connection between the firearm and the underlying crime.
 
 
 19
 It has fallen to the courts to fill in the contours of the Section 924(c) elements "uses or carries" a firearm "during and in relation to" a drug trafficking crime. Courts of appeal in at least four Circuits have held that mere possession of a firearm, even if it is concealed, can constitute "use" under Section 924(c) in situations where such possession is an integral part of the predicate offense and facilitates the commission of that offense. United States v. Meggett, 875 F.2d 24, 28-29 (2d Cir.1989) (citing, inter alia, United States v. Matra, 841 F.2d 837 (8th Cir.1988); United States v. Robinson, 857 F.2d 1006 (5th Cir.1988); United States v. Mason, 658 F.2d 1263 (9th Cir.1981)). To "carry" a firearm for Section 924(c) purposes means to have it within reach during the commission of a drug offense. United States v. Feliz-Cordero, 859 F.2d 250, 253 (2d Cir.1988) (citing United States v. Brockington, 849 F.2d 872 (4th Cir.1988).
 
 
 20
 As to when the use or carrying of the firearm may be said to be "in relation to" a drug trafficking offense, the Ninth Circuit has held:
 
 
 21
 If the firearm is within the possession or control of a person who commits an underlying crime as defined by the statute, and the circumstances of the case show that the firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity or ability to display or discharge the weapon to protect himself or intimidate others, whether or not such display or discharge in fact occurred, then there is a violation of the statute.
 
 
 22
 United States v. Stewart, 779 F.2d 538, 540 (9th Cir.1985) (emphasis added). The evaluation of whether a firearm was used in relation to an offense is to be made in consideration of the totality of the circumstances. United States v. Brown, 915 F.2d 219, 226 (6th Cir.1990).
 
 
 23
 In considering all of the circumstances in the present case, the jury found that the threatening of the drug worker was not an inadvertent use of the weapon that played no role in the offense, but rather was directly related to Delinois's drug trafficking activities. There was direct evidence that the firearm was used to further the drug trafficking activities that characterized the ongoing conspiracy in which Delinois, Martinez, and the worker were involved. The dispute with the worker, which centered on the worker's "smoking the profits" instead of transmitting the money from the sales to Delinois, was integrally related to the drug trafficking operation: by using the gun to threaten the worker Delinois intended to halt the worker's behavior and thus increase the profits of the enterprise. But for Delinois's drug trafficking, the threat and intimidation with a firearm would not have occurred.
 
 
 24
 Delinois contends that his denial that the intimidation incident took place should outweigh the testimony of the eyewitness Martinez. The evaluation of witnesses' credibility is not for the appellate court, but is solely the province of the jury. United States v. Shipp, 409 F.2d 33, 36-37 (4th Cir.), cert. denied, 396 U.S. 864 (1969). The jury considered the testimony of both Delinois and Martinez and rejected that of Delinois. The issue is not one of credibility, but of sufficiency of the evidence to support the jury's finding. Considering the evidence, as we must, in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80 (1942), we find that a rational jury could have found the essential elements of a Section 924(c) offense beyond a reasonable doubt. United States v. MacDougall, 790 F.2d 1135, 1151 (4th Cir.1986). Therefore, the jury's verdict is to be upheld. Id.
 
 Co-conspirator Statements
 
 25
 Delinois objects to the admission of certain statements made by coconspirators in the course of what the jury found to be a single conspiracy. Fed.R.Evid. 801(d)(2)(E) permits the admission of such statements as non-hearsay, if they were made during and in furtherance of the conspiracy. The trial court must make an initial determination that the preponderance of evidence reveals that a conspiracy existed and that declarant and the defendant were connected with it. 4 Weinstein on Evidence at 801-331 (1990). In making this determination, the court may consider the co-conspirator's statements themselves. Bourjaily v. United States, 479 U.S. 171, 181 (1987). The statements may be admitted if the court is satisfied that it is more likely than not that the statement was made during the course and furtherance of an illegal association to which the declarant and defendant were parties. United States v. DeLuna, 763 F.2d 897, 908-09 (8th Cir.), cert. denied sub nom. Thomas v. United States, 474 U.S. 980 (1985). The court's decision to admit the statements is not to be reversed unless it is found to be clearly erroneous. Id. at 909.
 
 
 26
 In the present case, the district court's decision to admit the statements is not clearly erroneous. Assuming arguendo that these statements are only "mere conversations between conspirators," as Delinois claims, they nevertheless furthered the conspiracy to the extent that they provided reassurance, served to maintain trust and cohesiveness among the co-conspirators, or informed the participants of the current status of the conspiracy. United States v. Ammar, 714 F.2d 248, 252 (2d Cir.), cert. denied, 464 U.S. 936 (1983). Moreover, there is abundant other evidence to support the conclusion that the parties were participating in an illegal association when the statements were made. The challenged statements were all made by conspirators who were involved in the Florida drug-buying excursion, as evidenced by photographs found at Delinois's residence. Because there was so much other evidence, including Delinois's own admissions as to his activities, it is highly probable that even if the statements were erroneously admitted, their admission did not substantially affect the jury's verdict and thus the error was harmless. Urbanik, supra, 801 F.2d at 699.
 
 
 27
 Finding no merit in any of Delinois's arguments, we must uphold the jury's verdict. The judgment of the district court is therefore
 
 
 28
 AFFIRMED.