**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                  No. 95-5701

JIMMY RAY GARTMAN, SR.,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Joseph F. Anderson, Jr., District Judge.
(CR-95-253)

Argued: March 7, 1997

Decided: April 23, 1997

Before HAMILTON, Circuit Judge, KISER, Chief United States
District Judge for the Western District of Virginia, sitting by
designation, and GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished opinion. Judge Goodwin wrote the opinion,
in which Judge Hamilton and Chief Judge Kiser joined.

_____

**COUNSEL**

**ARGUED:** Suzanne Elizabeth Coe, ARNOLD & COE, L.L.P.,
Greenville, South Carolina, for Appellant. John Michael Barton,
Assistant United States Attorney, Columbia, South Carolina, for
Appellee. **ON BRIEF:** Margaret B. Seymour, United States Attorney,
Columbia, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

GOODWIN, District Judge:

The defendant-appellant Gartman was convicted on all three counts of an indictment charging him with conspiring to murder federal employees, attempting to retaliate against a federal witness or infor-
mant, and conspiring to murder a federally protected witness.* He appeals from the trial court's denial of a motion for judgment of acquittal on all counts. He asserts that the evidence was insufficient
to sustain his conviction. We affirm.

_____

*Gartman was convicted in count I of violating 18 U.S.C. § 1117 by conspiring to murder Agent Ronald Grosse and Assistant United States
Attorney Dean Eichelberger. Section 1117 provides in pertinent part that
"[i]f two or more persons conspire to violate section . . . 1114 . . . of this
title, and one or more of such persons do any overt act to effect the object
of the conspiracy, each shall be" guilty of a crime. Section 1114 makes
it unlawful to "kill or attempt to kill . . . any Assistant United States
Attorney, . . . [or] any officer or employee of the Federal Bureau of
Investigation . . . ." Gartman was convicted in count II of aiding and
abetting an attempt to kill Robert Arnold in violation of 18 U.S.C. § 1513. Section 1513 makes it unlawful to "kill[] or attempt to kill another person with intent to retaliate against any person for -- (A) the
attendance of a witness or party at an official proceeding, or any testi-
mony given . . . or (B) providing to a law enforcement officer any infor-
mation relating to the commission or possible commission of a Federal
offense." Gartman was convicted in count III of violating 18 U.S.C. § 371 by conspiring to murder Sharon Gregory in violation of 18 U.S.C.
§ 1513. Section 371 provides in pertinent part that "[i]f two or more per-
sons conspire to commit any offense against the United States, . .

. and
one or more of such persons do any act to effect the object of the con-
spiracy, each shall be" guilty of a crime.

I.

The defendant Jimmy Ray Gartman was unemployed and lived in a small house with his working wife. Chris Elkins (his nephew) and Elkins's friend Edwin Atwood visited Gartman regularly. During the late fall of 1994, Gartman spent "two or three" hours several times a week regaling these young men with vituperations directed at those persons whom he had cast as his enemies and persecutors -- former insurance investigator Robert Arnold; FBI agent Ronald Grosse; Assistant United States Attorney Dean Eichelberger; and federal witness Sharon Gregory.

Elkins and Atwood's trial testimony made Gartman's animus towards these four individuals explicable. As to Robert Arnold, they testified that Gartman long suspected Arnold of and blamed him for the killing of his youngest son, despite the acquittal on self-defense grounds of the son's ex-wife. Moreover, Arnold had investigated over 50 allegedly fraudulent insurance claims filed by Gartman and his family and had turned over his information to the FBI before leaving the investigation business.

Gartman's animus towards Grosse, Eichelberger, and Gregory resulted from several interrelated events surrounding the ensuing FBI and grand jury investigation into the alleged insurance fraud. Agent Grosse was the lead FBI investigator; AUSA Eichelberger was the attorney in charge; and Sharon Gregory was a federal witness against Gartman and his son Ray Gartman, Jr. Elkins and Atwood testified that Gartman felt persecuted by this investigation. Gartman, Jr. accused Gregory (his ex-girlfriend) of cooperating with the authorities in the grand jury investigation, assaulted her, was convicted of retaliating against a federally protected witness in violation of 18 U.S.C. § 1512(b), and was sentenced to 68 months imprisonment. Agent Grosse investigated the assault and AUSA Eichelberger prosecuted the case. Elkins and Atwood testified that Gartman blamed Gregory, Grosse, and Eichelberger for "setting up" his son on the assault conviction.

Gartman engaged in no more than verbal vilification of Arnold, Grosse, Eichelberger, and Gregory, however, until a December 1994 meeting between Gartman, Elkins, and Atwood. Atwood testified that

3

during this visit Gartman stated that somebody needed to "take care of" Arnold. (J.A. 80). Gartman then went into his bedroom, retrieved some cash, and offered Elkins and Atwood $5,000 to kill Arnold (about $2,000 down, about $3,000 later). (J.A. 80-81, 198-200). Gartman then went back into his bedroom and returned without the money. When he returned, he said that "he wouldn't mind taking care of" or "also wanted . . . to get rid of Ronald Grosse, Dean Eichelberger, and Sharon Gregory." (J.A. 82, 200). Elkins asked how much Gartman would pay. Atwood does not remember any specific amounts, but Elkins testified that Gartman would pay $30,000 each for Grosse and Eichelberger and $20,000 for Gregory. (J.A. 82, 201).

The next day, Elkins and Atwood told Gartman that they agreed to kill all four individuals, starting with Arnold:

> Q: You and Mr. Elkins agreed to kill four people; is that correct?
>
> A: Yes, sir.
>
> . . .
>
> A: We went back and I believe Chris stated to him that we would do it.
>
> Q: What was your understanding, what was the defendant's reaction when you told him we will do it?
>
> A: He seemed pretty happy.
>
> Q: What was your understanding, Mr. Atwood, as to what you and Chris had agreed with the defendant you were going to do?
>
> A: To initially kill Robert Arnold and if successfully completed Dean Eichelberger, Ron Gross, and Sharon Gregory.
>
> Q: You were going to murder Robert Arnold and if you pulled that off murder the rest; is that correct?

4

A: Yes, sir.

(J.A. 84, 85-86; testimony of Atwood).

Q: Did you and Mr. Atwood discuss what the defendant had suggested to you?

A: Yes, sir.

Q: Did you and Mr. Atwood agree to do what the defendant had asked you to do?

A: Yes, sir.

Q: What was your understanding of what you and Mr. Atwood had agreed to do for the defendant?

A: To kill these people.

Q: Who are these people again?

A: Sharon Gregory, Ronald Grosse, Dean Eichelberger, and Robert Arnold.

Q: Who were you going to start with?

A: Robert Arnold.

Q: Why were you going to start with Robert Arnold?

A: Because he wanted him first.

Q: It was the defendant's idea?

A: Yes, sir.

Q: How much money were you going to get paid?

A: For Ronald Arnold $5,000.

5

Q: For Dean Eichelberger?

A: $30,000.

Q: Ronald Grosse?

A: $30,000.

Q: Why were you getting paid so much more for that?

A: Because of the importance of them people was so much more.

Q: How about Sharon Gregory?

A: $20,000.

Q: Why were you getting paid so much more for her?

A: Because she was a federal witness.

Q: When did you and Mr. Atwood tell the defendant that you would in fact go forward with this plan?

A: The next day, I believe.

Q: What did you tell him?

A: We told him we would do it. We didn't know who Robert Arnold was.

(J.A. 202-03; testimony of Elkins).

Elkins and Atwood testified that Gartman provided them with information to aid them in killing the four targets. Gartman told them
the location of Arnold's place of business and suggested the manner in which Arnold should be killed. He told them that Grosse drove a blue Thunderbird with tinted windows and lived in Lexington County. They learned from Gartman that Eichelberger shops at Wal-Mart on

6

the weekends and he suggested that they should kill him there with a rifle. Gartman told them that Gregory worked at Bob Johnson's Auto Body, that she lived behind that business, and that they should kill her by placing a bomb under her house. (J.A. 201, 207-09).

At Gartman's direction, Elkins and Atwood made botched attempts to carry out their end of the agreement. They obtained a semi-automatic pistol to first kill Arnold. Elkins, who was carrying the pistol, and Atwood met Arnold to arrange a test-drive with him in a car he was selling. Although Elkins and Atwood took a test drive, Arnold did not ride with them, foiling that killing scenario. They reported their blundered efforts to Gartman and plotted their next move. Again at Gartman's direction, Elkins and Atwood planned to call Arnold at a wrecker service he owned in an attempt to lure him out and kill him. After drinking several beers, Atwood put on a country accent and called Arnold. However, Arnold asked skeptical questions and advised that he would not pick them up until after daylight, leading Elkins and Atwood to abort plan two. Elkins testified that despite their bungling, Gartman gave him $2000, which he split with Atwood. Both young men soon became nervous and Atwood reported the plot to the FBI. Shortly thereafter, Elkins and Atwood began cooperating with the authorities.

II.

Gartman first argues that this case involved four separate conspiracies with four individual targets -- Arnold, Grosse, Eichelberger, and Gregory -- and that the only overt acts proved were in furtherance of a single conspiracy to kill Arnold. The issue, therefore, is whether there were four separate conspiracies or one conspiracy to kill four individuals.

To answer the single/multiple conspiracy question, the government and the defendant each cite <u>United States v. Leavis</u>, 853 F.2d 215 (4th Cir. 1988). The <u>Leavis</u> court provided that "[t]he question whether the evidence shows a single conspiracy or multiple conspiracies . . . is

one of fact and is properly the province of the jury." <u>Id</u>. at 218. "A
single conspiracy exists where there is `one overall agreement,' or
`one general business venture'." <u>Id</u>. (citations omitted). "Whether
there is a single conspiracy or multiple conspiracies depends upon
the

7

overlap of key actors, methods, and goals." Id. (citing United States
v. Crockett, 813 F.2d 1310, 1216-17 (4th Cir. 1987); United States
v.
Little, 753 F.2d 1420, 1448 (9th Cir. 1984)).

Although the indictment alleges in the preamble that there was one
overall goal to Gartman's actions (Indictment ¶ 5, J.A. 2), it
charged
three counts -- conspiracy to kill Grosse and Eichelberger; aiding
and
abetting an attempt to kill Arnold; and conspiracy to kill Gregory.
As
the government explained to the trial court, three counts were
charged
because the conspiracy could not statutorily be charged in one
count
-- only Grosse and Eichelberger were federal employees, Gregory
was a federal witness but not an employee of the United States, and
attempt more closely fit the charged conduct relating to Arnold
than
did conspiracy. This fact does not prevent the jury from finding
that
one overall conspiracy existed: "Simply put, the fact that an
indict-
ment charges conspiracy in separate counts does not mean that the
conspiracies charged necessarily must be separate and distinct."
See
United States v. Fisher, 3 F.3d 456, 460 (1st Cir. 1993). In
Fisher, the
defendant argued that the government could not make a "one big con-
spiracy" argument because the indictment charged separate conspira-
cies. Id. The First Circuit rejected that argument and noted that
"there
is a complete lack of authority supporting the novel proposition
Fisher
asserts." Id. Although the First Circuit noted that a defendant
could
always argue prejudicial variance, the government would not be pre-
vented from arguing one big conspiracy because the purpose of the
indictment is primarily to provide notice of the charges to the
defen-
dant, not as a means of assessing proof. Id. at 460 & 460 n.10.
Here,
we also note that the indictment did assert "one big conspiracy" in
the
preamble; that Gartman did not offer an instruction at trial on
single/
multiple conspiracies; and that Gartman has not raised variance as
an
issue.

We must sustain a jury verdict "if there is substantial evidence,

tak-
ing the view most favorable to the government, to support it." <u>Glasser</u>
<u>v. United States</u>, 315 U.S. 60, 80 (1942). We must consider circum-
stantial as well as direct evidence and allow the government the bene-
fit of all reasonable inferences from facts proven to facts sought to be
established. <u>United States v. Tresvant</u>, 677 F.2d 1018, 1021 (4th Cir.
1982). Construing the evidence -- including testimony from the alleged coconspirators Elkins and Atwood -- in the light most favor-

8

able to the government, we find there is substantial evidence to support the jury's verdict.

Here, the trial evidence was that there was a single conspiracy to kill all four individuals. First, both Elkins and Atwood testified repeatedly that their agreement with Gartman was to kill all four individuals, starting with Arnold. (J.A. 82-83, 84-86, 146, 198, 200-01, 202-03). Additionally, Gartman's offer to have all four individuals killed was made at the same time -- during one conversation with Elkins and Atwood -- and followed complaints about all four individuals for their activities related to the insurance investigation. The Leavis factors also point to one conspiracy. The key actors -- Gartman, Elkins, and Atwood -- not only overlapped but were identical. Although the methods varied somewhat, the goal to be achieved was the same -- killing Gartman's enemies. Clearly, a jury could rationally find that there was only "one overall agreement," and thus one conspiracy, to kill all four individuals.

The proof also established overt acts in furtherance of the conspiracy to kill Gartman's four enemies. Among the overt acts proved were the following: Gartman had conversations with Elkins and Atwood about the method, timing, and location of the murders; Elkins and Atwood obtained a gun to kill Arnold; they tried to lure Arnold out to kill him during a test-drive; they tried to lure Arnold out to kill him with a late night call to Arnold's wrecker service; and Gartman gave $2000 to Elkins and Atwood for their initial efforts. When a single conspiracy has multiple goals (i.e., killing four people), any overt act directed towards one of the goals (i.e., killing Arnold) is sufficient to sustain the overall conspiracy conviction. See United States v. Head, 641 F.2d 174, 181 (4th Cir. 1981), cert. denied, 462 U.S. 1132 (1983). Therefore, Gartman's conviction on counts I and III are affirmed.

III.

Gartman next argues that the evidence was insufficient to sustain his conviction on count II of the indictment for aiding and abetting an attempted retaliation against a federal witness or informant in

vio-
lation of 18 U.S.C. § 1513. His conviction must be sustained if a
rational jury could find beyond a reasonable doubt that Gartman

9

intended to have Arnold killed in retaliation for Arnold providing information to the government relating to Gartman's alleged insurance fraud activities.

The evidence that Gartman intended to have Arnold killed because of his insurance fraud investigation and for turning his files over to the FBI included the following: There was testimony from both Elkins and Atwood that Gartman "hated" Arnold both for his son's death <u>and</u> for the insurance investigation. (J.A. 69-70; 194). Elkins also testified that Gartman was aware that Arnold had been the original investigator into the alleged insurance fraud and that Arnold had turned his files over to the FBI: "Q: What did[Gartman] tell you about insurance fraud investigations? A: He told me he was being investigated because Robert Arnold had initially been the investigator of it. He had turned his files over to the FBI." (J.A. 191). Atwood testified that during the original conversation with Gartman about killing Arnold "[w]e were talking specifically about Robert Arnold at the time, about the fact that he possibly had something to do with his son's death. The investigation he did on insurance fraud. That somebody needed to take care of him." (J.A. 80). Finally, Gartman's request to murder Arnold came during the same conversation in which Gartman also sought to have the FBI agent and the AUSA investigating the insurance fraud and the grand jury witness who implicated him for insurance fraud murdered. Therefore, Gartman's conviction on count II is affirmed.

IV.

For the reasons stated, we affirm Gartman's conviction.

<u>AFFIRMED</u>

10