**UNITED STATES of America, Appellee,**

v.

**LAM KWONG–WAH, Appellant.**

No. 91–3131.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 31, 1992.

Decided May 19, 1992.

Blair G. Brown, with whom Roger E. Zuckerman, Washington, D.C., was on the brief, for appellant.

William J. Landers, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Elizabeth Trosman and Lisa Gok, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before WALD, EDWARDS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

In the first appeal of Lam Kwong–Wah ("Lam"), we affirmed his conviction for conspiracy to distribute heroin under 21 U.S.C. §§ 841(a) and 846, but vacated his sentence because of error in calculating the proper offense level under the United States Sentencing Guidelines. *United States v. Lam Kwong–Wah*, 924 F.2d 298 (D.C.Cir.1991). In our remand we asked the trial judge "for a clarification of the factual findings concerning what Lam knew or reasonably could have foreseen concerning the quantity of drugs involved in the transaction." *Id.* at 307.[1] Lam now appeals his new sentence, challenging the district court's factual finding that he had scienter as to the 3.4 kilograms of heroin involved in the transaction.[2] First, Lam argues that a clear and convincing standard of proof rather than preponderance of the evidence is required under the Guidelines for the trial judge's finding of scienter as to the amount of drugs. Second, Lam argues that there was not sufficient evidence to support the trial judge's determination that Lam knew or could reasonably have foreseen that the deal involved 3.4 kilograms of heroin. We reject Lam's contentions and affirm his sentence.

## I. BACKGROUND

In 1989 Lam was tried and convicted of conspiracy to distribute heroin. Lam's arrest resulted from a lengthy sting operation in which Indalecio Guzman, an undercover agent from the Federal Bureau of Investigation ("FBI"), bought heroin on different occasions from several of Lam's co-defendants. Lam was involved in only one of those transactions, playing a relatively minor role in a proposed sale to Agent Guzman of a large amount of heroin, that was to take place on April 15, 1988, in Secaucus, New Jersey.[3]

At meetings during the summer of 1987, Agent Guzman discussed with several of Lam's co-defendants, including Ng Wah and Peter Yuen, his intention to purchase 45 pounds (approximately 20 kilograms) of

---

1. We held in our initial decision that the trial judge was required to apply the Sentencing Guidelines in effect prior to November 1, 1989, the date on which certain amendments took effect, and that the unamended Guidelines required proof that Lam had scienter as to the amount of heroin to be distributed. *Lam Kwong–Wah*, 924 F.2d at 305.

2. Based on the finding of scienter as to the quantity of 3.4 kilograms, Lam was assigned a base offense level of 34. *See* U.S.S.G. § 2D1.1 ("Drug Quantity Table"). Lam was given a four-level reduction because the trial judge found him to be a "minimal participant." *See* U.S.S.C. § 3B1.2. With his criminal history category of

I, the Guidelines prescribe a sentencing range of 97–121 months. *See* U.S.S.G. § 5A ("Sentencing Table"). Lam was sentenced to 97 months, the lowest end of the prescribed range. Had the sentencing judge been unable to make a finding as to the quantity involved beyond the "detectable amount" for which Lam was convicted, the Drug Quantity Table for heroin (any amount less than 5 grams) would have assigned a base offense level of 12, resulting in a sentence range of 10–16 months.

3. Lam's co-defendant, Mah Kwok–Ching, attempted to perpetrate his own "sting" on Agent Guzman, delivering cornstarch instead of genuine heroin.

heroin. The deal was delayed until April 12, 1988, at which time Ng Wah and Yuen agreed to sell that amount of heroin to Agent Guzman for a price of $3 million. At that time Ng Wah and Yuen also discussed with Guzman the logistics of delivering such a large quantity in a single deal. Eventually it was agreed that the heroin would be delivered to Guzman in separate installments over the space of several hours on April 14 or 15.

At the time of these preliminary discussions Lam was not involved in the conspiracy. Lam's participation began on the evening of April 14, 1988, when Ng Wah contacted him in New York City. At Ng Wah's request, Lam agreed to set up a meeting in which Ng Wah and Yuen could meet with a supplier of the drugs. Lam then contacted Mah Kwok–Ching ("Mah"), whom Lam knew to be a heroin dealer, and arranged for the meeting to take place in a fast food restaurant in downtown Manhattan. The meeting came off as planned, with Lam in attendance while Ng Wah, Yuen, and Mah engaged in their initial discussions.

Immediately after the meeting in New York, the men drove to the Embassy Suites Hotel in Secaucus, New Jersey, to meet with Agent Guzman (in a room where the FBI had set up surveillance cameras). Lam drove Mah in Mah's car from the meeting in New York to Secaucus. Upon arriving at the hotel, Ng Wah and Yuen met with Guzman in the agent's hotel room. Lam and Mah remained in Mah's car and continued to drive around while the meeting took place in the FBI agent's hotel room. When Lam and Mah returned to the hotel later, Ng Wah met them and told Mah he wanted the heroin delivered that night. Mah refused, saying that he could not make the delivery until the next day. During the meeting in the hotel, Agent Guzman and Ng Wah ultimately agreed that the first of the three proposed installments would be for five "Hong Kong pounds" (approximately 3.4 kilograms).

The next day Mah telephoned Lam early in the morning and asked him to come to the hotel in Secaucus. Mah told him that he should keep a look-out for police during the delivery. Lam and Mah later arrived at the hotel parking lot driving separate cars: Lam in an Oldsmobile, Mah in his Mercedes. They conferred briefly, and then drove both cars separately to a nearby supermarket parking lot. After about fifteen minutes, both cars returned to the hotel. Mah, who was still driving the Mercedes, got out of his car and removed a large plastic shopping bag from the trunk, placing it in the car's passenger compartment. Mah then walked over to the Oldsmobile driven by Lam, got into the car, and remained there for a few minutes. Lam and Mah then got out of the car and stood in the parking lot where they were joined by Ng Wah.

In the meantime, Yuen had been in the hotel with Agent Guzman. Yuen told the agent that the heroin was in the Mercedes and that Guzman could examine it himself. Agent Guzman approached the Mercedes and began to look in the plastic bag. At that moment Mah became very agitated, pushed the agent away, got into the Mercedes and drove off. Eventually, Ng Wah and Yuen were able to contact Mah by cellular phone and convince him to return to the hotel parking lot. When Mah returned, the narcotics agents arrested all of the conspirators including Lam. Laboratory tests later revealed the plastic shopping bag to contain cornstarch, not heroin.

At trial the government presented the testimony of Agent Guzman and Phylomen Yau, another FBI agent who had interviewed Lam immediately after his arrest. Agent Yau translated from Cantonese his conversation with Lam, in which Lam admitted having arranged the initial meeting between Ng Wah and Mah, and having been present during the meeting.[4] Although there was no direct evidence showing that Lam had actually overheard discussions of the exact amounts involved in

---

**4.** During his trial testimony, Lam also admitted having overheard at least some of the discussion between Ng Wah and Mah, although he claimed

at that time that he thought they were discussing "something about flour."

the total deal (20 kilograms) or in the first installment (3.4 kilograms), the district judge found that Lam knew or reasonably could have foreseen that 3.4 kilograms were slated for the first delivery on April 15. The district court's conclusion was based on the following evidence: (1) Lam arranged for and was present at the first meeting between Ng Wah, the broker, and Mah, the supplier; (2) Lam drove Mah to Secaucus after the first meeting; (3) Lam was aware that extensive precautions were being taken to guard the delivery, including his own role in the counter-surveillance of the parking lot; and (4) Lam had an opportunity on the morning of the delivery to observe the shopping bag containing the "sham heroin."[5] From all these circumstances, the district court drew inferences that Lam either overheard discussions of the amount involved in the deal or, minimally, could have deduced that Mah intended to deliver a substantial amount of heroin that morning. The district court thus concluded that it was more likely than not that Lam knew or reasonably could have foreseen the amount of heroin to be delivered in the first installment.

## II. DISCUSSION

### A. *Standard of Proof*

■ Under our constitutional framework, the government must prove the facts establishing a criminal defendant's guilt beyond a reasonable doubt. "The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). While no law may provide for a lesser burden of proof as to any element of an offense, nevertheless, it is up to the

legislature to define the elements of the basic offense. *McMillan v. Pennsylvania,* 477 U.S. 79, 85, 106 S.Ct. 2411, 2415, 91 L.Ed.2d 67 (1986). The legislature may also link the "severity of punishment" to "the presence or absence of an identified fact" without requiring that fact be proved beyond a reasonable doubt. *Id.* at 84, 106 S.Ct. at 2415. So long as the legislature has not tailored the statute to lower the burden of proof for a basic element of the offense, *i.e.,* so that the punishment enhancement factor becomes "a tail which wags the dog of the substantive offense," the Constitution is not violated. *Id.* at 88, 106 S.Ct. at 2417.

■ The Supreme Court has not yet addressed the issue of whether the quantity of drugs involved in a crime is a basic element of the offense, which must be proved beyond a reasonable doubt. This court, however, recently joined the majority of other circuits holding that the quantity of drugs involved in a conspiracy or distribution charge is not a basic element of the offense, but is rather a sentencing factor to be determined by the judge. *See United States v. Patrick,* 959 F.2d 991 (D.C.Cir. 1992); *United States v. Moreno,* 899 F.2d 465, 472–73 (6th Cir.1990); *United States v. Barnes,* 890 F.2d 545, 551 n. 6 (1st Cir.1989), *cert. denied,* 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990); *United States v. Powell,* 886 F.2d 81, 85 (4th Cir. 1989), *cert. denied,* 493 U.S. 1084, 110 S.Ct. 1144, 107 L.Ed.2d 1049 (1990); *see also* 21 U.S.C. § 841(b) (references to quantity of controlled substance appears under subsection entitled "penalties"). And although the Sentencing Guidelines themselves place no particular burden of proof on the government (or the defendant) to establish disputed sentencing factors, *see* U.S.S.G. § 6A1.3,[6] it is now well-settled that factual

---

**5.** The district court also concluded erroneously that Lam was "present during the late-evening hotel meeting among Wah, Yuen, and Mah, which was the last meeting before the deal." Agent Guzman's testimony clearly shows, however, that neither Lam nor Mah was present during any of the meetings in the hotel.

**6.** Section 6A1.3 provides:
*Resolution of Disputed Factors*

(a) When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the

determinations upon which the judge bases a Guidelines sentence may normally be found by a preponderance of the evidence. *See, e.g., United States v. Burke,* 888 F.2d 862 (D.C.Cir.1989); *United States v. Walton,* 908 F.2d 1289, 1302 (6th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *United States v. Ross,* 905 F.2d 1050, 1054 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 172, 112 L.Ed.2d 136 (1990); *United States v. Wilson,* 900 F.2d 1350, 1354 (9th Cir.1990); *United States v. Frederick,* 897 F.2d 490, 493 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 171, 112 L.Ed.2d 135 (1990); *United States v. McDowell,* 888 F.2d 285, 290–91 (3d Cir.1989); *United States v. Guerra,* 888 F.2d 247, 250–51 (2d Cir.1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990); · *United States v. Ehret,* 885 F.2d 441, 444 (8th Cir.1989), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990); *United States v.* *Urrego–Linares,* 879 F.2d 1234, 1237–38 (4th Cir.), *cert. denied,* 493 U.S. 943, 110 S.Ct. 346, 107 L.Ed.2d 334 (1989); *United States v. Wright,* 873 F.2d 437, 441 (1st Cir.1989); *see also* Commentary, U.S.S.G. § 6A1.3 (amendment effective Nov. 1, 1991, stating "Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving factual disputes").

■ Against the backdrop of these principles, we consider Lam's argument that the preponderance of the evidence standard should not govern the factual finding of the district court as to his scienter of the amount of drugs involved in the conspiracy. Lam does not refer us to any direct authority for such a proposition; he argues only that an exception to the preponderance standard must be recognized here because this particular factual finding has so significant an impact on the length of his sentence. Lam was in fact convicted under 21 U.S.C. §§ 841(a) and 846 for conspiracy to distribute a "detectable amount" of heroin. Depending on the facts found at sentencing as to his knowledge of the amount involved, he could have been assigned an "offense level" under the Guidelines' "Drug Quantity Table" ranging from Level 12—based on a "detectable amount," to Level 36—based on the entire 20.4 kilograms involved in the conspiracy, *see* U.S.S.G. § 2D1.1; the difference in his sentence under the two scenarios could range from 12 months to 262 months. So critical a choice of offense level, he contends, must be rooted firmly in clear and convincing evidence supporting the finding as to what amount of drugs he knew was involved.

Lam contends that the Guidelines themselves require that the finding be made under the clear and convincing standard of proof. However, he points only to the circumstance that initially the Commission was deliberately silent on the burden of proof applicable to sentencing factors such as the amount of drugs of which he had scienter. *See* U.S.S.G. § 6A1.3. The Sentencing Commission noted that under the Guidelines "the resolution of disputed sentencing factors often will have a definite and *often quite substantial impact* on the sentence." Supplementary Report on the Initial Sentencing Guidelines and Policy Statements, *reprinted in* THOMAS HUTCHINSON & DAVID YELLEN, FEDERAL SENTENCING LAW AND PRACTICE (Supp.1989) (emphasis supplied). The Commission followed that observation by raising, but not answering, the question of "what is the weight of the burden of persuasion (i.e., is it sufficient to prove the asserted factor by a preponderance of the evidence or is a higher degree of certainty required?)," finding it "inappropriate for the Commission to specify across-the-board procedural rules, even as-

rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy. The Commentary to that section reads:

In pre-guidelines practice, factors relevant to sentencing were often determined in an informal fashion. The informality was to some extent explained by the fact that particular offense and offender characteristics rarely have a highly specific or required sentencing consequence. *This situation will no longer exist under sentencing guidelines. The court's resolution of disputed sentencing factors will usually have a measurable effect on the applicable punishment.*

U.S.S.G. § 6A1.3 (emphasis supplied).

suming the Commission has the power to do so," and ultimately concluding that procedural issues such as what standard of proof applies to these factual issues "will be decided in the caselaw, as it develops, against the background of the Commission's general objective of ensuring that sentencing procedures reflect as much care and accuracy as is practically feasible." *Id.* Thus, there is no explicit requirement in the Guidelines that a heightened burden of proof be employed to determine the amount of drugs involved in a crime.

■ Lam, however, refers us to *United States v. Kikumura,* 918 F.2d 1084 (3d Cir.1990), a case in which the Third Circuit held that the Guidelines required a heightened burden of proof because of the extraordinary effect of certain factual issues on the ultimate sentence. In *Kikumura,* the defendant was charged and convicted of passport and weapons offenses. Although the criminal statute provided for a maximum sentence of 100 years, the Guidelines prescribed a sentence of approximately 30 months. Upon sentencing, the district judge made a departure from the Guidelines, *see* 18 U.S.C. § 3553(b), based on other conduct for which the defendant was not charged (terrorist acts), and imposed a sentence of 30 *years.* The Third Circuit held that a "clear and convincing" standard is "implicit in the statutory requirement that a sentencing court 'find' certain considerations in order to justify a departure [under] 18 U.S.C. § 3553(b)" from the Guidelines of such extraordinary proportions. *Id.* at 1102.

Lam also argues that due process requires that such a weighty factual determination be made under the heightened standard of clear and convincing evidence, in contrast to the "garden variety" of sentencing determinations which need only be found by the preponderance standard. And indeed Lam is right that the Supreme Court has held that when significant interests are at stake, due process may require a court to find particular facts under the "clear and convincing" standard. *See, e.g., Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (termination of parental rights); *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (civil commitment). The Court did not, however, extend that additional protection to "sentencing considerations," in a case presenting a question similar to the one before us. *See McMillan,* 477 U.S. at 79, 106 S.Ct. at 2411. In *McMillan,* the Court noted that it had already rejected the argument that due process required a heightened burden of proof whenever the "severity of punishment" for a crime is linked "to the presence or absence of an identified fact," 477 U.S. at 84, 106 S.Ct. at 2415 (citing *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)), and upheld a statute that made "visible possession of a firearm" a sentencing factor (triggering the imposition of a mandatory minimum sentence), which need only be proved by a preponderance of the evidence, rather than an element of an offense itself. The Court also rejected the argument that the intermediate standard of proof—"clear and convincing" evidence—must apply to the finding that a firearm was visibly possessed, holding that the preponderance of the evidence standard satisfied due process. *McMillan,* 477 U.S. at 91–93, 106 S.Ct. at 2418–2420. In support of its holding, the Court pointed out that "sentencing courts have traditionally heard evidence and found facts without any prescribed burden at all." *Id.* at 91, 106 S.Ct. at 2419 (citing *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949)).[7]

---

**7.** Yet here again another circuit has expressed itself (albeit in dicta) that in extraordinary circumstances due process might require a heightened burden of proof for certain factual issues at sentencing. *See United States v. Townley,* 929 F.2d 365, 370 (8th Cir.1991). In *Townley,* the defendant was convicted of a single distribution charge involving 27 grams of cocaine, but at sentencing the government presented evidence linking the defendant to *separate drug transactions* involving 6,000 grams of cocaine. The additional drugs increased the base offense level by 18 levels (adding 100 months to the sentence). The Eighth Circuit reversed the sentence, finding the evidence insufficient *under the preponderance of the evidence standard,* but did "not foreclose the possibility that in an ex-

While it is not necessary for us to foreclose the possibility that in extraordinary circumstances a clear and convincing standard may be required, we do not find that Lam's situation presents any such circumstances. First, unlike in *Kikumura*, Lam's sentence was determined solely on the basis of conduct of which he was actually convicted, not on alleged separate offenses not charged in the indictment or proved at trial. In 21 U.S.C. § 841, Congress designed a statute which, as construed by all courts thus far, required only a "detectable amount" of heroin for conviction, but escalated penalties dramatically depending upon the amount of drugs involved. Under such a scheme, the determination of the precise amount the defendant knowingly possessed or distributed was inevitably left to the courts at sentencing. Thus, although Lam was found beyond a reasonable doubt to have known he was trading in drugs, the statutory delegation was made to the sentencing court as to how much drugs he knew about. On its face, we certainly do not find this scheme to be a case of the "tail wagging the dog of the substantive offense," nor do we find it to pose so extraordinary a situation as to invoke a higher burden of proof for the scienter finding on amount.

Moreover, it is beyond dispute that a substantial amount of heroin was involved in the first delivery and that Lam had reason to know that. Indeed, defense counsel concedes that the evidence supported a finding that Lam had scienter as to 500 grams of heroin. Appellant's Brief at 33, 35. Under the Guidelines, the base offense level for possession of 500 grams is 28 (78–97 months for a defendant with criminal history category I). With the 3.4–kilogram quantity, the base offense level is 34 (151–188 months under criminal history category I). While a six-level increase is not insignificant, it does not present the enormous disparity involved in *Kikumura*—a twenty-two-level increase. *Accord United States v. Trujillo*, 959 F.2d 1377 (7th Cir.1992) (six-level increase "not so drastic as to invoke *Kikumura* scrutiny").[8]

## B. *Sufficiency of the Evidence*

On remand the district court made detailed factual findings under the preponderance of the evidence standard that Lam knew or reasonably could have foreseen that 3.4 kilograms of heroin was involved in the deal. Lam argues that the evidence was insufficient to support that conclusion. He contends that at most, the record supported a finding that he had scienter as to 500 grams—not the 3.4 kilograms delivered in the first installment of the conspiracy.[9]

In sentencing issues, we owe substantial deference to the factual findings of the district court. *See* 18 U.S.C. § 3742(e) (in reviewing a sentence, "[t]he court of appeals shall ... accept the findings of fact

ceptional case ... the clear and convincing standard ... might apply." *Id.* at 370.

**8.** Lam also cites a recent Ninth Circuit en banc decision in support of his argument. *United States v. Restrepo*, 946 F.2d 654 (9th Cir.1991). First, the question in that case was whether conduct that would have amounted to a *separate offense* if it had been included in the indictment must be proved at sentencing beyond a reasonable doubt, not whether the amount of drugs involved in the transaction *for which a conviction had been obtained* must be proved by a higher standard. The en banc majority held that preponderance was the appropriate standard for proving the separate conduct, although a concurring opinion suggested that "heightened procedural protections" might be required when the result produces a significantly greater sentence. 946 F.2d at 661 (Tang, J., concurring). Second, although several judges dissented, they noted that "the quantity [of drugs] is a sentenc-

ing issue to be raised after proof of a defendant's guilt," and that "due process might be satisfied if the preponderance standard were applied to determine the quantity of drugs involved in the two sales for which appellant was [actually] convicted." *Id.* at 668 (Norris, J., dissenting).

**9.** Lam also points us to some decisions suggesting that in conspiracy cases where the intended deal is never actually consummated and no drugs recovered, sentencing courts should err on the side of caution in resolving the question as to the amount involved. *See, e.g., United States v. Walton*, 908 F.2d at 1301. We have no quarrel with that recommendation, but note that in Lam's case the district court followed that advice, holding Lam accountable for only the 3.4 kilograms involved in the first delivery, and not the approximately 20 kilograms contemplated in the total deal.

of the district court unless they are clearly erroneous"). We may reverse the factfinder's conclusion only if we are "left with a definite and firm conviction" that it is mistaken. *United States v. Jones,* 948 F.2d 732 (D.C.Cir.1991) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). In applying this standard, no legal distinction is made between circumstantial and direct evidence. *United States v. Davis,* 562 F.2d 681, 684 (D.C.Cir.1977). When ruling upon the sufficiency of evidence supporting a trial court's finding, an appellate court must, moreover, "give full play to the role of the factfinder to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *See United States v. Treadwell,* 760 F.2d 327, 333 (D.C.Cir.1985), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986). The obvious reason for deference is that the trial judge "who heard all the evidence ... may perhaps draw inferences that we would have difficulty discerning from the paper record." *Lam Kwong–Wah,* 924 F.2d at 307.

While the record shows that Lam did not himself attend the meetings with Agent Guzman in which the amounts of the incremental deliveries were negotiated, and there is no direct evidence that the amount of drugs involved was discussed in the meetings Lam did attend, we cannot find that the district court's inference of fact that Lam had scienter as to the amount to be delivered in the first installment was not justified from the proven circumstances. It is undisputed that Lam provided the crucial introduction for the broker of the deal (Ng Wah) to the supplier of the drugs (Mah). Lam also attended the first meeting between these two principal actors and was a witness to their conversation initiating the chain of events, *i.e.,* the trip to New Jersey that followed swiftly thereafter, culminating in the aborted delivery and arrests the next morning in the hotel parking lot. It seems doubtful indeed that there would not have been some discussion of amounts and dollars at that initial meeting or during the drive to Secaucus which Lam overheard, even if he was not an active participant in the negotiations. The sole purpose of the meeting he arranged and sat in on was to negotiate a deal for a large quantity of heroin to be sold by Ng Wah to Agent Guzman; it was not unreasonable for the district court to conclude from his presence during this initial phase that it was more likely than not that Lam was aware of the amounts involved.

It is also undisputed that Ng Wah discussed the exact details of delivery amounts with Agent Guzman the night before the first delivery, and that Lam was present during Ng Wah's discussion with Mah immediately after that meeting with Guzman. Again, it was certainly reasonable for the trial judge to infer that Ng Wah related to Mah at this second meeting the terms of the delivery just discussed with Guzman, and that Lam overheard that discussion. Mah was after all the prime supplier and the person who would later drive the drugs to the rendezvous. Lam's argument in the main is that he was so peripheral to the deal that it was more likely than not that he was unaware of the amounts involved, or would not have understood what was being said if the amounts were discussed in his presence. While not an inherently implausible argument, we certainly cannot say that we are "left with a definite and firm conviction" that the district court erred in resolving these inferences against Lam.

In sum, we cannot conclude that the trial judge erred in finding by a preponderance of the evidence that, at some point during this scenario, beginning with Lam's setting up and attending the original meeting in which the parties entered into negotiation for the heroin, his driving to Secaucus with the main supplier, his being present later at a discussion with that supplier just after the details of the delivery were discussed by the FBI agent and the broker, and finally his meeting with the supplier on the morning of the delivery when the shopping bag containing the heroin was in plain sight, Lam overheard or even participated in the discussion of how much heroin ($3 million worth) was involved. He acted as an intermediary for and attended the first

meeting between the supplier and the broker in the deal, acted as a chauffeur to the principal supplier, acted as a "lookout" while the first delivery was carried out. Surely, the record as a whole amply supports the trial judge's conclusion as to Lam's scienter about the amount of drugs involved. We therefore uphold the trial court's factual finding on scienter, and affirm the sentence imposed.

*So ordered.*