18 F.3d 954
 305 U.S.App.D.C. 194
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
UNITED STATES of America
v.
Carmelita JOHNSON, Appellant.
 No. 91-3221.
 United States Court of Appeals, District of Columbia Circuit.
 Feb. 17, 1994.
 
 Before: GINSBURG and RANDOLPH, Circuit Judges and SHADUR, Senior District Judge.*
 JUDGMENT
 PER CURIAM.
 
 
 1
 This appeal was considered on the record from the United States District Court for the District of Columbia and on the briefs of counsel. The court is satisfied, after reviewing the parties' briefs, that appropriate disposition of the case does not call for further opinion. See D.C.Cir.Rule 36(b). On consideration thereof, it is
 
 
 2
 ORDERED and ADJUDGED by the Court that the conviction from which this appeal was taken be affirmed for the reasons set forth in the attached memorandum.
 
 
 3
 The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.Rule 41(a).
 
 ATTACHMENT
 MEMORANDUM
 
 4
 Carmelita Johnson ("Johnson") appeals her conviction by a jury on two drug-related counts in a four-count indictment:
 
 
 5
 1. Count One, in which she was charged with possession with intent to distribute five grams or more of a mixture or substance containing detectible amounts of crack (21 U.S.C. Sec. 841(a)(1)[1]), and for which she was sentenced to a 63-month term in the custody of the Attorney General; and
 
 
 6
 2. Count Four, in which she was charged with knowingly, intentionally and unlawfully making available for use a leased building for the unlawful distribution of a controlled substance (Section 856(a)(2)), for which she received a concurrent 12-month term in custody.
 
 
 7
 On appeal Johnson urges reversal because of two purported errors in her trial:
 
 
 8
 1. the claimed insufficiency of the evidence to support the possession-with-intent-to-distribute charge and
 
 
 9
 2. the assertedly erroneous admission of testimony of the government's drug expert, who volunteered a statement that Johnson characterizes as unduly prejudicial to her.
 
 
 10
 We affirm Johnson's conviction on both counts.
 
 Facts at Trial
 
 11
 Johnson was tried jointly with Tyrone Brawner ("Brawner"), whose appeal from his conviction was initially consolidated with Johnson's but has now been deferred pending the en banc consideration of another case that poses one of the critical issues raised by Brawner. All of the charges against both defendants stemmed from a warrant-authorized police raid and search of the Washington, D.C. house leased by Johnson. Drugs and drug paraphernalia were found in three principal locations in the house:
 
 
 12
 1. in the kitchen, where Johnson and another co-defendant Terry Hooks (whom the jury acquitted) were apprehended by the police;
 
 2. in the front upstairs bedroom; and
 
 13
 3. in the rear upstairs bedroom (Johnson's bedroom), where the police found Brawner.
 
 
 14
 In addition, other drug paraphernalia--two ziplock bags and five homemade crack pipes--were found on a shelf in the hallway at the top of the stairs.
 
 
 15
 Fully nine police officers were involved in the raid, entering the building through both the front and the back door. Those who entered the kitchen found Johnson lying on her stomach on the floor, while Hooks was trying to get out of the back door. There was a good deal of drug-related material in the kitchen, although the actual quantity of drugs was small (just .25 grams of crack cocaine):
 
 
 16
 1. on top of the refrigerator, a can dusted with white cocaine residue together with a razor blade;
 
 
 17
 2. on the kitchen table, a black pouch containing 18 small ziplock bags sprinkled with traces of white powder cocaine;
 
 
 18
 3. in a kitchen cabinet, a plastic homemade pipe and three other ziplock bags;
 
 
 19
 4. floating in a large bucket on the kitchen floor, another plastic ziplock bag with a small amount of cocaine residue (the liquid in that bucket was not a controlled substance);
 
 
 20
 5. in a kitchen drawer, another small plastic crack pipe;
 
 
 21
 6. underneath the kitchen sink, two other homemade pipes; and
 
 
 22
 7. in the freezer, four small tinfoil packets with a green leafy substance and traces of PCP (those materials were not a subject of the indictment).
 
 
 23
 In open view in the kitchen were a number of documents and bills in Johnson's name.
 
 
 24
 As for Brawner, who was the father of Johnson's baby, the record is not clear as to just where he lived (he did not live at the address that he later gave the police, and he was not a co-lessee of his mother's apartment). Just before the raid an officer who was watching the upstairs windows saw Brawner look out of the front bedroom window and then disappear from view. Then when the officers entered the house they found Brawner sitting in the upstairs rear bedroom holding his infant son in his arms. Their search of that bedroom led to major discoveries: a loaded nine-millimeter semiautomatic Smith & Wesson pistol in one closet, and in the other closet a black leather pouch containing a large white rock, seven green ziplock bags holding chunks of a white rock-like substance, and tinfoil. That pouch was the only cache of a significant amount of cocaine anywhere in the house--over 14 grams.
 
 
 25
 As to the third location, the upstairs front bedroom, its closet contained two syringes with cocaine residue and a woman's jacket with two large ziplock bags containing numerous smaller ziplock bags. In that bedroom's dresser drawer there were six more ziplock bags containing cocaine residue, along with another homemade crack pipe. That dresser contained an identification card with Johnson's name and photograph, as well as some personal papers belonging to Johnson.
 
 
 26
 In addition to the government's occurrence witnesses, the prosecutor called the police department's resident expert Detective David Stroud ("Stroud")--who testified (Tr. 138) that he has served as an opinion witness over 900 times![2] --to render a set of opinions to tie the evidence together. Stroud was found qualified by the district judge to testify to "use of illicit drugs, how illicit drugs are sold here in the District of Columbia, and how they're packaged and sold on the streets" (Tr. 138): testimony that was clearly relevant and that fit the purpose of Fed.R.Evid. 702. But Stroud also engaged in the type of overreaching that is sometimes encountered from the professional witness when he volunteered this in response to the prosecutor's question about how District of Columbia houses are used for the sale of crack cocaine (Tr. 155):
 
 
 27
 A. Well, first of all, in order to obtain a premises to sell out of a drug operation, drug dealers usually prey on somebody who's weak, drug addicts themselves or somebody who needs cash real bad, or a combination of the three, and once they get inside those premises, they'll offer the person who owns the premises, or is leasing those premises, they offer that person either drugs, money, a job within the organization, or a combination of the three. Once they set up shop in that premise, they may manufacture drugs there, package the drugs there, sell the drugs out of that premise, or they may use drugs on the premises as well.
 
 
 28
 Johnson's trial lawyer promptly objected that the only person to whom Stroud could have been referring in the context of the case on trial was Johnson, thus essentially telling the jury "that Ms. Johnson is a weak person, a drug addict, was taken advantage of by drug dealers and there is no evidence to support that" (Tr. 157). Johnson's counsel characterized that as very prejudicial and moved that the testimony be stricken or alternatively for a mistrial (id.)--motions that were promptly denied (Tr. 158).
 
 Sufficiency of the Evidence
 
 29
 We have not set out the evidence in greater detail because of the high hurdle that must be overcome by any defendant who challenges the sufficiency of evidence for a conviction--the familiar standard of "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" ( Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original)). Not for nothing have we described a defendant's task in that respect as "daunting" ( United States v. Teffera, 985 F.2d 1082, 1085 (D.C.Cir.1993)). As the ensuing discussion reflects, this is not to say that we subscribe fully to the government's position on the present appeal, but rather that such total acceptance is not needed to sustain Johnson's conviction.
 
 
 30
 When it comes to the substantial quantity of drugs (and the handgun) that were found hidden in the upstairs back bedroom, here is what the United States tells us (at its Br. 21, in the course of focusing its attack on co-defendant Brawner):
 
 
 31
 While it is true that the drugs and gun were not found on Brawner's lap or in his pockets, a reasonable juror could have accepted the government's theory, based on the evidence, that Brawner saw the approaching police when he looked out the upstairs front bedroom window (the room where he purportedly lived) and then scurried to the upstairs rear bedroom window with the idea of jettisoning the evidence out of the window (Tr. 296). When he noticed the waiting police officers in the back of the house, Brawner quickly stashed the drugs in one closet and the gun in another closet and struck an angelic pose, cradling his infant son, for the benefit of the arresting police officers (id.).
 
 
 32
 It will be recalled that it would be necessary to attribute those 14 grams to Johnson as well if the government were indeed required, as Count One reads literally, to prove her personal involvement in the possession of at least five grams of cocaine with the intention to distribute it. And because Johnson was not of course in the actual possession of those hidden drugs, her criminal responsibility for that 14-gram quantity would necessarily have to be based either on constructive possession or on her aiding and abetting Brawner as to those drugs.
 
 
 33
 In 1992, after the trial in this case, we joined all of the other circuits that have held that the recitation of a specific quantity of drugs in a Section 841(a)(1) indictment is merely surplusage and not an essential element of the offense ( United States v. Patrick, 959 F.2d 991, 995-96 n. 5 (D.C.Cir.1992); United States v. Allen, 960 F.2d 1055, 1058 (D.C.Cir.1992) (per curiam); United States v. Lam Kwong-Wah, 966 F.2d 682, 685 (D.C.Cir.1992)). That is so because Section 841(a) defines the actual offense without any reference to quantity, while Section 841(b) sets out the different levels of punishment for differing quantities of each type of controlled substance. And that latter set of provisions as to punishment forms no part of the jury's resolution of the question of guilt or innocence, conviction or acquittal.
 
 
 34
 If the trial judge had somehow anticipated our 1992 rulings by omitting the possession of "5 or more grams of a mixture or substance containing cocaine base" when he instructed the jury as to the elements the government had to prove beyond a reasonable doubt, the issue would be simple indeed. Under Section 841(a)(1) a conviction on a possession-with-intent-to-distribute charge requires proof only of a detectable amount of cocaine. Here the evidence of cocaine-related activity in close proximity to Johnson (in the kitchen where she was apprehended) was overwhelming. In addition, the jury could certainly have attributed to Johnson knowledge of the drug-related paraphernalia in the upstairs front bedroom dresser drawer (where Johnson's identification card and personal papers were also located) and elsewhere in that same bedroom. And it is an understatement to say that a rational jury could have determined that the evidence amply indicated drug-distribution activity and not merely drug-user activity (among other things, the presence of such a large number of ziplock bags--obviously saved for use or reuse--plainly bespeaks distribution). All of that being so, any error that might be attributed to defendant Stroud's quoted statement--even though that statement might arguably be viewed as a linchpin of any effort to pin the 14-gram quantity on Johnson in constructive possession terms--would certainly have been labeled as harmless.
 
 
 35
 But we need not follow that constructive possession route to its ultimate conclusion under the instructions that were given to the jury, for the record fully supports the jury's verdict on another alternative that was also properly submitted to it. As to Count One the jury was instructed that it could also answer "Yes" to the question whether the government has proved the charge as to a defendant (here Johnson) if it found that the Count One offense was committed by someone (in this instance Brawner) and if the defendant under consideration (again Johnson) "participated in some way, either directly or indirectly, in the commission of the offense" and "did so with an unlawful purpose." That aiding and abetting instruction was amplified by telling the jury that it was required to find beyond a reasonable doubt that the Count One offense "was committed by someone" (Brawner) and that the defendant under consideration (Johnson) "intentionally assisted the principal offender or offenders in the commission of the offense."
 
 
 36
 Either with or without our having to draw the same inference that we found to have supported the conviction in United States v. Jenkins, 928 F.2d 1175, 1179 (D.C.Cir.1991) ("the natural inference is that those who live in a house know what is going on inside, particularly in the common areas"), on all of the evidence a rational jury could surely have found the aiding and abetting requirement satisfied as to Johnson. And that being so, the potentially problematic statement by Detective Stroud that we have quoted earlier would again constitute nothing more than harmless error.
 
 Detective Stroud's Statement
 
 37
 What has been said to this point has rejected Johnson's challenge to her conviction on the more serious of the two charges naming her, based on Detective Stroud's troubling statement. It takes only a moment's reflection to see that the same analysis also insulates the other count of conviction from attack on that score. That other count was brought under Section 856(a), which makes it unlawful for a building lessee to make her building available for the unlawful storage or distribution of a controlled substance. Again the evidence of Johnson's guilt on that count is overwhelming, and indeed Johnson does not challenge the sufficiency of the evidence on that count as such. To the extent that her objection to Detective Stroud's testimony may be read as extending to her conviction on that count, once more any claimed error is plainly harmless.
 
 Conclusion
 
 38
 Neither challenge to Johnson's conviction survives analysis under the applicable standards. We therefore affirm her conviction over the objections that she has posed.
 
 
 
 *
 Honorable Milton I. Shadur, United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 Further references to Title 21 provisions will simply take the form "Section--."
 
 
 [2]
 Nearly 20 of our reported opinions in other cases have had occasion to refer to one aspect or another of Stroud's testimony there