**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 95-5515

TYRONE LAMONT SMITH, a/k/a Blue,
a/k/a Tyrone Eady,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 95-5516

JOSEPH EDWARDS MONROE, a/k/a
Slim,
Defendant-Appellant.

Appeals from the United States District Court
for the Western District of Virginia, at Charlottesville.
Henry C. Morgan, Jr., District Judge, sitting by designation.
(CR-94-41)

Argued: April 1, 1996

Decided: June 4, 1996

Before HALL and MOTZ, Circuit Judges, and BUTZNER, Senior
Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** David Brian Franzen, FEIL, PETTIT & WILLIAMS, P.L.C., Charlottesville, Virginia, for Appellant Smith; Sa'ad El-Amin, EL-AMIN & CRAWFORD, Richmond, Virginia, for Appellant Monroe. Stephen Urban Baer, Assistant United States Attorney, Charlottesville, Virginia, for Appellee. **ON BRIEF:** Robert P. Crouch, Jr., United States Attorney, Charlottesville, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Appellants, Tyrone Lamont Smith and James Edwards Monroe, appeal their convictions and sentences for conspiracy to possess with intent to distribute or to distribute more than fifty grams of cocaine base (crack), in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(A). Monroe also appeals his conviction and sentence for possession with intent to distribute more than five grams of cocaine base, in violation of the same statutes. Finding no reversible error, we affirm.

I.

Appellants' first argument is that there was a "fatal" variance between the allegations in the indictment and the evidence at trial. Specifically, they maintain that while the indictment alleged a single conspiracy, the evidence at trial indicated that there were multiple conspiracies. At trial, the government bore the burden of proving the existence of the single conspiracy charged in the indictment. United States v. Hines, 717 F.2d 1481, 1489 (4th Cir. 1983), cert. denied, 467 U.S. 1214 (1984). See also, United States v. Barsanti, 943 F.2d 428, 439 (4th Cir. 1991), cert. denied, 503 U.S. 936 (1992); United States v. Leavis, 853 F.2d 215, 218 (4th Cir. 1988). The existence of a single

2

conspiracy is a question of fact for the jury. United States v. Banks, 10 F.3d 1044, 1051 (4th Cir. 1993), cert. denied , 114 S. Ct. 1850 (1994); Leavis, 853 F.2d at 218 (citing United States v. Urbanik, 801 F.2d 692, 695 (4th Cir. 1986)).

Determination of whether the government has proven a single conspiracy is basically a "special version" of a sufficiency of evidence evaluation. Banks, 10 F.3d at 1051. Thus, in reviewing a conviction, we merely determine

> whether any rational trier of fact could have found the essential elements of the [conspiracy here charged in the indictment] beyond a reasonable doubt, and do so by assessing the evidence in the light most favorable to the Government, assuming its credibility, drawing all favorable inferences from it, and taking into account all the evidence, however adduced.

Banks, 10 F.3d at 1051 (internal citations and quotations omitted) (alteration in original).

In determining whether there is evidence of a single conspiracy, as opposed to multiple conspiracies,

> the focal point of the analysis is whether the alleged co-conspirators were united in a common unlawful goal or purpose. Of principal concern is whether the conduct of the alleged co-conspirators, however diverse and far ranging, exhibits an interdependence. In other words, of principal concern is whether the activities of alleged co-conspirators in one aspect of the charged scheme were necessary or advantageous to the success of the activities of co-conspirators in another aspect of the charged scheme, or the success of the venture as a whole.

United States v. Daily, 921 F.2d 994, 1007 (10th Cir. 1990), cert. denied, 502 U.S. 952 (1991) (citations omitted). See also United States v. Barsanti, 943 F.2d 428, 439 (4th Cir. 1991), ("A single conspiracy exists where there is one overall agreement,. . . or one general

3

business venture. Whether there is a single conspiracy depends upon overlap of the main actors, methods and goals"), <u>cert. denied</u>, 503 U.S. 936 (1992)(citations and internal quotations omitted). With these principles in mind, we turn to the evidence in this case.

A.

Sometime prior to the summer of 1993 (exactly when is unclear from the record), Barry Lampkins brought appellant Smith to Charlottesville, Virginia to sell drugs. Lampkins and Smith knew each other from the Bronx, having lived in the same apartment building on Colgate Avenue while growing up. The two worked together, obtaining drugs (primarily crack cocaine) from New York and distributing the drugs in Charlottesville. In addition to selling drugs on the street, specifically the "drug strip" on Page Street, Smith and Lampkins would trade crack to addicts in exchange for the use of their homes for selling crack. One of these addicts was John Turner, who lived in a boarding house on West Street. Another was Gloria Newman, who lived at 772 Ridge Street. Smith and Lampkins also sold crack through the use of "runners," drug users who would sell to fellow users in exchange for "samples" of the product. Milton Dickerson was one of their runners.

In the summer of 1993, Lampkins recruited Tahir Branch to come to Charlottesville from New York to sell drugs. Branch, who also lived in the Colgate Avenue building as a child, knew Smith as well as Lampkins. Branch and his friend "Juice" took the bus to Charlottesville and met Lampkins at Gloria Newman's house on Ridge Street. Branch testified that during the summer of 1993, he witnessed Dickerson working as a "runner" for Smith <u>and</u> Lampkins.

Apparently, shortly thereafter, Smith and Lampkins had a "falling out" over money. Lampkins' step-father had failed to deliver a shipment of drugs, and Lampkins was unable to repay Smith for the shipment. Both men continued to operate in Charlottesville for some period of time after this quarrel.

Meanwhile, Lampkins directed Branch and Juice to sell marijuana at first and crack when the marijuana ran out. Branch and Juice sold on Page and Paoli Streets, while Lampkins sold out of the boarding

4

house on West Street. At the end of a month, Lampkins paid Branch $400 and Branch decided not to work for Lampkins any more because he did not like the way Lampkins ran things and did not think that Lampkins had paid him enough. There were also rumors that Lampkins was using drugs. Branch went back to New York after the month.

"Several months" later, while in New York, Smith asked Branch if he wanted to go back to Charlottesville with him, and Branch agreed. Smith and Branch took a bus from New York, transporting two "G packs" ($2000 worth) of crack cocaine supplied by Smith. In Charlottesville, Smith and Branch stayed at the house of a drug user named Robert, in the 700 block of Ridge Street, just up the block from Gloria Newman's house. They gave Robert small amounts of money as well as crack for letting them stay there. Smith and Branch sold the crack across town on Page and Paoli Streets. Danny Williams, a user who lived on Paoli Street, worked as a"runner." Smith told Branch he could also go and sell out of the house of Pamela Powell, another user, who lived on Hardy Drive. After they had sold all the crack (in about five days), Smith paid Branch around $400. They went back to New York to "re-up," that is, to use the $2000 they had made to buy more cocaine to convert to crack and bring back to Charlottesville.

Subsequently, on several occasions, Branch traveled to Charlottesville alone, each time with 5 "G packs" of crack. Smith told him when to go and provided him with crack and either bus or train fare. Branch stayed at Robert's house, on Ridge Street, and kept the money from the sale of the crack at Gloria Newman's house, also on Ridge Street. He sold the crack at Page and Paoli Streets. After selling all the crack, Branch returned to New York and gave Smith the money he had made. Smith usually paid him between $400 and $600. On one trip, Smith gave Branch a key and told him to stay with his friend, Chrissy Willis, who lived in the Fifteenth Street Apartments. Branch originally went back to Ridge Street, where he felt more comfortable, but then went to Chrissy Willis' house because Lampkins and his "crew" were staying at Gloria Newman's house, and Branch did not think it was safe to stay on Ridge Street too.

One of Branch's trips occurred while Smith was in jail in Atlantic City. This trip was conducted in the "same exact way" as the previous

5

trips. Branch visited Smith in jail, and Smith told him that when he got out, he was going to "step up" the operation and they would both make a lot of money. After Smith got out of jail, he brought appellant Monroe into the operation. Smith, Monroe, and Branch all took a bus to Charlottesville, transporting "two large cookies" of crack, worth about $20,000. They stayed at Chrissy Willis' house (now on Paoli Street, her old building having burned down). At Chrissy Willis' house, Smith cut up the "cookies" and Monroe recooked the "crumbs." Danny Williams and his girlfriend, Mary Etta Brown, had moved to Preston Street, and the majority of the $20,000 worth of crack was sold from their house. Smith, Branch, and Monroe worked in "shifts," each selling one "G pack" at a time.

Smith, Branch, and Monroe made a second trip to Charlottesville with $20,000 worth of crack, this time accompanied by a woman named Envogue. They sold the drugs using the same procedure as before. At the end of May, 1994, Branch and Monroe made a third trip with $20,000 worth of crack, accompanied by a different woman. Smith did not go on this trip because he had to go to a family reunion. On May 31, 1994, police raided Danny Williams' apartment. Branch and Monroe were running down the hall when police broke down the door. They were found "hiding" in the bathroom, along with a cellular phone and the remains of a "G pack" of crack. The police found $798 on Tahir Branch's person.

B.

Appellants argue that the "falling out" between Smith and Lampkins and the subsequent competition between them"clearly established" multiple conspiracies, rather than a single, ongoing conspiracy. As this court has noted, however, the fact that drug dealers "may sometimes, or even always, compete for supplies or customers in serving [the] market does not on that account alone disprove the existence of a single conspiracy to achieve the overall results of their several efforts." Banks, 10 F.3d at 1054; United States v. Johnson, 54 F.3d 1150, 1154-55 (4th Cir.), cert. denied, 116 S. Ct. 266 (1995). The jury could have found from the evidence that despite their "falling out," Lampkins and Branch did not completely disassociate from each other. Appellants point to Branch's testimony that, at one point, when he was considering working for Smith, he was threatened by

6

people working for Lampkins. While holding a shotgun, they told him that if he was working for Smith, he was "going against the grain," because he had first come to Charlottesville with Lampkins, and that he should not come down (to Charlottesville) anymore. This testimony clearly indicates competition, but not necessarily separate conspiracies. Branch further testified that he later talked to Lampkins about this incident and Lampkins told him "They took it as you going against the grain. That's how they took it. I can't stop them from doing any actions." Still later, Lampkins apologized to Branch about the incident and told him everything was "cool." Although this evidence is not overwhelming, based on it, the jury could have concluded that Lampkins and his "crew" and Smith and his "crew" were but two competing branches of the same overall conspiracy.

Additionally, even if Lampkins did leave the organization entirely to start his own organization, the evidence supported the conclusion that Smith continued to run the operation that Lampkins and Smith had once run together. After the "falling out" with Lampkins, Smith continued transporting crack into Charlottesville and selling it at Page and Paoli Streets, as he had while working with Lampkins. He continued using "runners" to sell the crack, and continued selling out of the houses of drug users, compensating them by giving them crack. He used Tahir Branch to transport and sell the crack, and until he "stepped up" the operation, paid Branch approximately what Lampkins had paid him. At first, Smith had Branch stay on Ridge Street (although not at Gloria Newman's house), and then go across town to sell at Page and Paoli. He also had Branch store his money at Gloria Newman's house. Initially, Branch took the bus to Charlottesville, as he had when he was brought in by Lampkins. Each time Branch ran out of crack to sell, he went back to New York to "re-up." Subsequently, certain changes were made, but the same overall operation continued. Branch began staying at Chrissy Willis' house instead of on Ridge Street, but continued selling on Page and Paoli Streets, using Danny Williams as a runner. Then Smith brought Monroe into the operation, and they began selling larger quantities of crack. They sold most of the crack from Danny Williams' house on Preston Street rather than on the street. They kept the money hidden at Chrissy Willis' house. Smith began paying Branch more for his efforts ($1000 instead of $400-$600). Based on this evidence, the jury could have

7

concluded that Smith continued to run the original conspiracy following his falling out with Lampkins.

Appellants next point to the fact that "for a short period of time Smith did not operate with anyone" as evidence of multiple conspiracies. Brief for Appellants at 18. The "gap" relied on by appellants occurred between the summer of 1993, when Branch was brought in by Lampkins, and the time "several months" later when Branch and Smith travelled to Charlottesville together. In United States v. Leavis, 853 F.2d 215, 218 (4th Cir. 1988), we found that an eight month gap between overt criminal acts did not demonstrate the existence of two separate conspiracies. Noting that a "single overall agreement need not be manifested by continuous activity," Id. at 218 (quoting United States v. Bloch, 696 F.2d 1213, 1215 (9th Cir. 1982)), we stated "[o]ur focus must not be on the timing of the conspiracy's operations, but on whether it functioned as an ongoing unit." Id. at 218-19. Based on the similarity between Smith's activities before and after the alleged "gap" in activity, a reasonable jury could have easily found that the conspiracy functioned as an ongoing unit. Moreover, the evidence clearly shows that inactivity by Smith did not necessarily mean that the conspiracy was inactive. For example, the operation continued to run as usual while Smith was incarcerated for a period of time. Additionally, Smith remained in New York (or elsewhere) during several of Branch's trips to Charlottesville, and did not accompany Branch and Monroe on the trip which led to their arrest.

Thus, the evidence presented to the jury supported a finding of a single, ongoing conspiracy. The jury was instructed that it could not convict if it found that the single conspiracy charged in the indictment had not been proved. "If the jury is properly instructed, the finding of a single conspiracy must stand unless the evidence, taken in the light most favorable to the government, would not allow a reasonable jury to so find." United States v. Urbanik, 801 F.2d 692, 695 (4th Cir. 1986). The evidence in this case certainly meets that standard.

II.

The second issue raised by appellants applies only to Smith. He contends that the trial court erred in ruling that the government had provided him with timely notice of its intent to enhance his sentence

8

based on his prior convictions. Under 21 U.S.C.§ 851, if the government intends to seek a sentence enhancement based on a defendant's prior convictions, "before trial," it must file an information with the court, stating the convictions to be relied upon, and must serve a copy of such information upon the defendant or his/her counsel.[1]

On February 16, 1995, five days before the trial began, AUSA Stephen Baer filed the required notices with the district court in both Smith and Monroe's cases. Each notice contained a certification that it was mailed to the defendant's counsel on the same date (2/16/95). On May 17, 1995, Smith's attorney, David B. Franzen filed a response to the § 851 notice, stating that he did not receive the notice until after the trial had concluded. This response did not indicate the date on which the notice was received. At Smith's sentencing hearing on June 12, 1995, Franzen stated that, while he could not remember the specific date, he knew that he had mailed a copy of the notice to Smith on March 1, and remembered mailing it either on the day he received it or the next day. Neither Franzen nor Monroe's counsel had date-stamped their respective notices upon receipt, but the court's copy of each notice was date-stamped February 16, 1995. Monroe's counsel stated that she had been provided the § 851 notice with respect to her client prior to February 16. Thus, she had no reason to object to a late filing, nor did she have a reason to remember when she received the notice mailed on February 16, as it was a duplicate. (She did have two copies of the notice, indicating that she did, at some point, receive the notice mailed on February 16).

The district court found as a fact that Smith's§ 851 notice was timely filed. Based on the evidence before the court, we cannot say that this finding was clearly erroneous.[2]

_____

[1] In <u>Kelly v. United States</u>, 29 F.3d 1107 (7th cir. 1994), the Seventh Circuit "join[ed] the five other circuits to have examined [the] question and conclude[d] that `before trial' means before the commencement of jury selection." <u>Id.</u> at 1110. The Fourth Circuit has not specifically addressed this question. We need not do so here because in this case there is a factual dispute as to when Smith received his notice, not a legal dispute as to the meaning of "before trial."

[2] An additional factor supporting the district court's finding is that Federal Rule of Criminal Procedure 49(b) provides that service upon a

9

III.

Appellants next contend that the court improperly sentenced them by relying on presentence reports that constituted "double hearsay." When Smith's counsel objected that certain information contained in his presentence report contained inadmissible hearsay and so was unreliable, the U.S. Probation Officer responded in an addendum to the report, explaining that the information had been summarized from presentence reports prepared for the New Jersey and New York state courts.

In response to Monroe's hearsay objections to information in his presentence report, the Probation Officer who had prepared that report responded that he and employees of the U.S. Attorney's Office verified the information. At Monroe's sentencing hearing, the officer testified that, for two of the convictions referred to in the report, he had received certified copies of the conviction judgments from the Superior Court of New Jersey, Atlantic County. He also testified that he had received additional information about those convictions from the probation office in New Jersey. As to the third conviction and narrative about which Monroe complains, the probation officer testified that he had not received a certified copy of the judgment of conviction (as he had requested), but he had received "a collateral of information" from the probation officer in the Southern District of New York.

The Federal Rules of Evidence (other than those rules regarding privileges) do not apply to sentencing proceedings. Fed. R. Evid. 1101(d)(3). This court and several of our sister circuits have held that a district court may consider uncorroborated hearsay evidence in determining sentence, as long as defendant is given an opportunity to refute the evidence. United States v. Terry, 916 F.2d 157, 161 (4th Cir. 1990). See also United States v. McDonald , 964 F.2d 390, 394 (5th Cir. 1992); United States v. Silverman, 976 F.2d 1502, 1512 (6th

_____

party's attorney "shall be made in the manner provided in civil actions." Federal Rule of Civil Procedure 5(b) states that "[s]ervice by mail is complete upon mailing." Therefore, having no reason to doubt the veracity of the certification, the notice to Smith was mailed, and thus served, on February 16, 1995, five days before trial.

10

Cir. 1992), cert. denied, 507 U.S. 990 (1993); United States v. Evans, 891 F.2d 686, 688 (8th Cir. 1989), cert. denied , 495 U.S. 931 (1990); United States v. Shepherd, 739 F.2d 510, 515 (10th Cir. 1984). In order to refute the evidence, the defendant must establish that it is inaccurate or unreliable, not merely that it is hearsay and thus "inadmissible." Terry, 916 F.2d at 162 ("A mere objection to the finding in the presentence report is not sufficient. The defendant has an affirmative duty to make a showing that the information in the presentence report is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate.") See also McDonald, 964 F.2d at 394; Silverman, 976 F.2d at 1512; Evans, 891 F.2d at 688. Neither Smith nor Monroe has asserted that the information contained in their presentence reports is untrue. Although both argue that the information is unreliable, they have offered no support for this conclusion other than the fact that the information is hearsay. Thus, neither appellant has carried his burden. See Terry , 916 F.2d at 162 ("appellant merely claimed the information . . . was unreliable. He never claimed it was inaccurate or untrue.") The district court permissibly relied on the information contained in the presentence reports.

IV.

Smith and Monroe claim that the district court erred in denying their motion for a mistrial after the court was advised that at least one juror observed them in handcuffs as they were brought into court. In United States v. Ford, 19 F.3d 1271 (8th Cir. 1993), cert. denied, 115 S. Ct. 741 (1995), the Eighth Circuit recently considered a similar situation. The court held that the defendant "ha[d] the burden of demonstrating prejudice from the juror's brief, inadvertent exposure to him in custody." Id. at 1272. As in Ford , here the jury's exposure to the defendants in handcuffs was both brief and inadvertent. Outside of mere speculation, Smith and Monroe have not demonstrated that any prejudice resulted from the incident, and thus the district court did not abuse its discretion in denying the mistrial.

V.

Smith and Monroe next argue that the trial court erred in granting an instruction that did not require the government to prove that the amount of drugs involved was the amount charged in the indictment.

11

In a related argument, they contend that the government did not, in fact, prove that the quantity of drugs involved was the quantity alleged in the indictment. The indictment charged that the appellants conspired "[t]o possess with the intent to distribute or distribute more than 50 grams of cocaine base . . . in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)." Count 4, applicable only to Monroe, charged him with possession with intent to distribute more than five grams of cocaine base. In response to a government request, and over appellants' objection, the court gave the jury the following instruction:

> The evidence received in this case need not prove the actual amount of the controlled substance that was part of the alleged transaction or the exact amount of the controlled substance alleged in the indictment as possessed with intent to distribute by the defendants.

> The government must prove beyond a reasonable doubt that a measurable amount of the controlled substance was, in fact, knowingly and intentionally possessed with the intent to distribute by the defendants.

Numerous courts of appeals, including this one, have held that sentence enhancement facts such as drug quantity are not elements of the offense that must be proven beyond a reasonable doubt. See United States v. Parker, 30 F.3d 542 (4th Cir.), cert. denied, 115 S. Ct. 605 (1994); United States v. Lam Kwong-Wah, 966 F.2d 682 (D.C. Cir.), cert. denied, 506 U.S. 901 (1992); United States v. Johnson, 944 F.2d 396 (8th Cir.), cert. denied, 502 U.S. 1008 (1991); United States v. Rigsby, 943 F.2d 631 (6th Cir. 1991), cert. denied, 503 U.S. 908 (1992); United States v. Engleman, 916 F.2d 182 (4th Cir. 1990); United States v. Peters, 912 F.2d 208 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991); United States v. Powell , 886 F.2d 81 (4th Cir. 1989), cert. denied, 493 U.S. 1084 (1990). See also McMillan v. Pennsylvania, 477 U.S. 79 (1986) (discussing state, rather than federal sentencing provisions). Appellants have failed to cite any authority to the contrary, but argue that in this case, the result should be different because the indictment expressly charged specific quantities of crack cocaine.

12

Appellants' argument ignores the fact that in several of the above-cited cases, as in this case, the indictment expressly charged a specific quantity of drugs. See Parker, 30 F.3d at 545 ("a grand jury . . . indicted Parker for one count of distributing, or possessing with the intent to distribute, more than five grams of crack"); Johnson, 944 F.2d at 405 (referring to "the allegation in the indictment that the defendant possessed at least five grams of cocaine base"); Rigsby, 943 F.2d at 634 ("Count one charged defendant with manufacturing 1,000 or more marijuana plants"); Powell, 886 F.2d at 82 ("Powell was charged with one count of possession with intent to distribute 50 grams or more of crack cocaine"). The remainder of the above-cited cases are unclear as to precisely what was charged in the indictments. See Lam Kwong-Wah, 966 F.2d at 683; Engleman , 916 F.2d at 183; Peters, 912 F.2d at 209. Regardless of whether a drug quantity is specifically charged in the indictment, each of the above-cited cases notes that the drug quantity is not a necessary element of the offense, but is rather a fact relating to sentencing, that may be proved merely by a preponderance of evidence and is determined by the court at sentencing. Parker, 30 F.3d at 554; Lam Kwong-Wah, 966 F.2d at 685-86; Johnson, 944 F.2d at 405; Rigsby, 943 F.2d at 640,**3** Engleman, 916 F.2d at 184; Peters, 912 F.2d at 212; Powell, 886 F.2d at 85.

Because the weight of authority establishes that drug quantity is not an element of the offense that must be proved beyond a reasonable doubt and determined by the jury, the jury instruction given in this case was proper. Appellants base their related argument (as to what the government actually proved) on the assumption that the quantity of drugs was a necessary element of the offense to be proven to the jury. Accordingly, this argument must also fail.

VI.

The next issue raised by the appellants is the district court's denial of their motions for a new trial following the disclosure that a government witness, Robert Tinsley, was a police informant making under-

_____

**3** The Court in Rigsby followed the "great weight of authority holding that quantity is not an element of a § 841 offense," 943 F.2d at 640, but did so with reluctance, and with an extensive discussion of the reasons for its disagreement with the rule. Id. at 340-43.

13

cover buys which were recorded by video and audio tapes. Appellants assert that one of the video tapes showed their co-defendant, Dickerson, engaged in a drug transaction with Tinsley. They maintain that they both wanted to show the video tapes to the jury, while Dickerson's counsel "vehemently objected," thus creating an irreconcilable conflict between the co-defendants. The government responds that no conflict existed, as the tapes do not depict Dickerson engaged in a drug transaction, rather, he can be seen in the background on one of the tapes. We need not reach this issue, however, as the appellants waived their right to challenge the denial of their motion for a new trial when they viewed the video tapes prior to the close of their cases but did not introduce them in evidence or explain on the record why they could not introduce them.

VII.

Finally, Monroe and Smith argue that they should have been granted a downward departure pursuant to § 5K2.0 of the Sentencing Guidelines. Section 5K2.0 provides for a departure when there exists "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." Smith and Monroe note that their sentencing ranges were "predicated upon there being a difference in the guidelines applicable to cocaine base, or `crack' cocaine and the guidelines applicable for powder cocaine." Brief for Appellants at 48. They argue that a downward departure was necessary to reflect the Sentencing Commission's February 28, 1995 recommendation to Congress to treat crack cocaine and powder cocaine equally. Appellants concede that they did not raise this issue in the district court, but assert that the court's failure to depart downward rises to the level of plain error. We do not agree, particularly in light of Congress' subsequent rejection of the Commission's recommendation. See United States v. Sanchez, 81 F.3d 9, 11 (1st Cir. 1996) (rejecting the identical argument, both because Congress rejected the recommendation, and because "[a] Sentencing Commission's recommendation to the Congress is not the kind of `circumstance' that[§ 5K2.0] covers").

The appellants' convictions and sentences are therefore

AFFIRMED.

14